MARGARET W. ROBERTSON, COMPLAINANT–APPELLANT, v. THE HACKENSACK TRUST CO., INDIVIDUALLY AND AS EXECUTOR, ET AL., DEFENDANTS–RESPONDENTS.

Argued November 1, 1948—Decided January 17, 1949.

306

*Mr. James A. Major* argued the cause for complainant-appellant (*Mr. Joseph H. Gaudielle,* attorney).

*Mr. William H. Wurts* argued the cause for defendants-respondents (*Messrs. Wurts & Plympton,* attorneys).

The opinion of the court was delivered by

CASE, J.  The complainant seeks to enforce an alleged oral contract made with her father, the defendants' testator, that "she would receive from her father, after his death everything that he owned" in consideration of her agreement to give up her home in Nyack, N. Y., live with him and his wife and take care of them for the rest of their lives.

Following the complainant's divorce from her first husband in 1928, her father and mother sold their house and came to live with her in Nyack.  In 1931 the father inherited property in Hackensack in which all three moved, the daughter selling her home in Nyack.  The mother was in poor health and the complainant kept house and looked after her until her death in 1936.  The complainant continued to keep house for her father until September, 1941, when she went out West without telling her father where she was going and remarried.  The first the father knew of it was by a telegram.  The complainant and her new husband lived with the father until September, 1942, when the husband's place of employment was transferred to Cincinnati.  The father remained alone in Hackensack until he died in September, 1943.  By his will executed in December, 1941, after the daughter's remarriage and while she and her husband were still living with him, he expressly disinherited her "as I have advanced substantial sums of money to her during my lifetime which I consider an ample remembrance from me for reason best known to her".

The evidence concerning the alleged oral agreement of the testator to will the property to the complainant is slight. An old friend of the testator testified that the complainant's parents wanted her to sell her house and go to Hackensack with them since there was no point in her continuing to work and stay in Nyack alone, inasmuch as they had sufficient money for

all three to live on, and that the complainant could "take care of them in Hackensack and look after the home until they die". The furthest his proof went was:

"Q. Did they say anything about property? A. After we are gone, you know you are the only one we got, everything going to belong to us (you)."

A second witness for the complainant, another friend of the father, testified that the testator had said:

"Yes, this property will be very valuable some day, Margaret will be well off, it is all hers after I die."

Only the complainant's husband testified that the testator had spoken in terms of an agreement:

"Q. Did he say anything else as to the relationship between him and his daughter? A. He mentioned the fact when he was gone everything was going to go to Margaret; there was some oral agreement he had with her.

Q. What was the agreement? A. All the property would go to Margaret.

Q. In return for what? A. Being his daughter and only heir and also because of services she was rendering."

The evidence of the two friends amounts merely to an expression of an intention of the testator to leave his property to his daughter as the natural object of his bounty; it does not sound in contract. Even part of the husband's testimony ("when he was gone everything was going to go to Margaret * * * being his daughter and only heir") goes no further. What remains ("some oral agreement he had with her * * * because of services she was rendering") falls far short of establishing by clear and convincing proof a contract to devise in terms definite and certain, which equity requires, among other prerequisites, before it will decree its enforcement. *Cooper v. Colson,* 66 *N. J. Eq.* 328 *(E. & A.* 1904*).*

Even if the contract had been proved by the strict test of equity, the complainant could still not prevail, for she failed, even on her own theory, to take care of her father for the rest of his life. True, she did the housework in the home in Hackensack and nursed her mother in her last illness, but she left her father in 1941 to go out West to get married and she left

him again in September, 1942, to go with her husband to his new place of employment in Cincinnati, doing nothing to look after her father during the last year of his life. The character of her services up to the time she left has also been called into question, the complainant's witnesses testifying to the father's expressions of satisfaction, while the defendants' witnesses recalled his complaints. It is undisputed that in connection with the complainant's moving to Cincinnati an altercation occurred between father and daughter over the property the daughter was proposing to take with her, which became so heated that the Hackensack police were summoned. The complainant manifestly did not herself perform the contract on which she is seeking to recover.

Appellant further argues that it was error to admit in evidence over her objection a paper writing done by the pen of, and signed by, the decedent on September 12, 1942. The proper study of that instrument requires that it should be stated in full. It follows:

"Hackensack, New Jersey—Sept.12/1942
To Whom It May Concern:

I regret very much to make a statement of this kind, but I consider it very essential, as it will undoubtedly clear up a condition which may possibly follow after my death or possibly before my demise.

About the fall or early winter of 1928 or 1929 I sold my property on Depot Place, South Nyack, N. Y. Wife and I then went to live with my daughter Margaret W. Wills on Piermont Ave., Nyack, N. Y., her home.

I lived in her house until about March 1931, she having divorced her husband.

During this period, I paid all expenses such as food, the interest on her mortgage, insurance, taxes. She paid no board, nor the cost of woman to help my wife on Friday of each week. I paid for coal to heat the house, put in three windows in kitchen, new sink and changed the wiring in the house, painted kitchen.

In 1931, March or April, I moved to Hackensack, N. J. to live at 469 Main Street, my father and stepmother having passed away.

She was working at the time (that is my daughter), gave up her position and lived with my wife and I at 469 Main Street.

She had no expenses whatever, and we made it very pleasant for her.

I bought her a car costing $1,006.00, Chrysler Coup, Rumble. Two consecutive years I paid for two trips to California to visit a friend. The two trips and stay in California costing about $1,000.00. I paid a dentist bill for $75.00 contracted while living at Nyack, New York.

I paid the insurance, repair, license plates on her car for four or five years, Habrich Co. Two weeks to Asbury Park, New Jersey for a number of years.

I paid for her wearing apparel and shoes during this period from March 1931 to January /41.

My wife passed away first of February 1936, and she continued to live with me, but life became unbearable two years ago. She called in a doctor from Medical Center, New York City, to examine me, and hoping that I would be put away.

I had a nervous breakdown, and while I was very sick, she had both Mackay and Greint, attorneys, come to the house, without my solicitation and forced me to sign a will, and Mackay and Freint were the only people present, I presume as witnesses. I regained strength, and found the paper at Hackensack Trust Company. That was her method of getting the property in her name. I had the will destroyed.

I have since then lived a life of Hell. I gave her power of attorney to collect the rents at property 342 Main St., Hackensack, New Jersey.

I have never been able to receive an accounting.

In ten years she has had about $5,000.00.

Signed John H. Stertzer."

The date of the writing was nine months after the execution of the decedent's will, three days before complainant permanently left the decedent's home—so respondents allege and as may, for the purposes of the argument, be assumed—at about the time when father and daughter disagreed concerning the attempted removal by the latter of certain personal property. . It is contended that those incidents imparted admissibility to a writing which would otherwise have been clearly prohibited as hearsay. Any dispute between the two as to which owned specific pieces of household furniture is of no significance in this litigation. The present suit is to obtain the real estate and personal property which belonged to the decedent at the time of his death or, failing that, to be awarded damages for the alleged breach. The execution and existence of the will is not attacked either for incompetency, fraud (except for the allegation that the making of it was a fraudulent disregard of the contract), undue influence, defective execution or otherwise. The complainant alleged a contract and the fulfillment thereof

by her; the defendants deny the making of a contract and allege a breach by complainant if there was a contract. Those were the issues.

■ Explanatory words uttered coincidentally with the happening of the event may be admissible; words which are merely narrative of conditions are not. *Burdge v. Retail Department Stores of America, Inc.,* 130 *N. J. L.* 81 *(E. & A.* 1943*); Thompson v. Giant Tiger Corporation,* 118 *N. J. L.* 10 *(E. & A.* 1937*).*

■ The declaration was highly self-serving. Generally a party may not make evidence in his own behalf either by oral or written statement. The death of a party does not give admissibility to a self-serving declaration otherwise inadmissible, *Gilbert v. Gilbert Machine Works,* 122 *N. J. L.* 533 *(Sup. Ct.* 1939*),* except in jurisdictions where the rule has been changed by statute (as, *e. g., Filosa's Case,* 4 *N. E. 2d* 439—*Mass.* 1936*).* Not only has the rule not been changed by statute here but, as we shall presently note in greater detail, we have a statute which, in its application to this case, would make the proposed deviation particularly inequitable.

■ The danger in admitting hearsay testimony turns upon the absence of time-honored bulwarks for the ascertaining of truth. Such testimony is not given within the solemnizing atmosphere of the court room, it is not given under oath, it is not subjected to the searching scrutiny of cross-examination. There are recognized exceptions to the rule against hearsay testimony, but the exceptions are based upon reasons which countervail the objections just stated; reasons which may be consolidated in the supposition that the circumstances surrounding a given event afford a sufficient probability of the truth to enable the jury or other fact-finder to appraise their worth. Such an exception is the dying declaration which, when admitted, derives its sanction from the fact that it is made in the view and expectation of approaching death; the situation of the party, under such solemnizing circumstances, creating an authentication equally impressive with that of an oath administered in a court of justice. *Donnelly v. State,* 26 *N. J. L.* 463, 497 *(Sup. Ct.* 1857*).*

■ The admission of *res gestae* is sometimes treated as an exception to the rule against hearsay and sometimes as a distinction from hearsay because of the connection with the principle fact under investigation. But, however, classified, the admissibility of the proofs as *res gestae* has as its justifying principle that truth, like the Master's robe, is of one piece, without seam, woven from the top throughout, that each fact has its inseparable attributes and its kindred facts materially affecting its character, and that the reproduction of a scene with its multiple incidents, each created naturally and without artificiality and not too distant in point of time, will by very quality and texture tend to disclose the truth. And this is the principle which is relied upon to justify the admission of the disputed paper. But the element which in our opinion distinguishes this case from all of the decisions, except where statute has otherwise enacted, relied upon in support of the admission, whether as *res gestae* or hearsay, is that the instrument, far from being a natural or inartificial outflow from an incident, or an uncalculated offshoot from the occurrence of an event, is a deliberate compilation, purporting to give a history of events, transactions and accusations bearing upon the relations between father and daughter, covering a period of many years, characterized by the author as a statement, and definitely aimed at making evidence for an anticipated lawsuit. Decedent's creative mind consciously and purposefully intervened between the events written of and the writing and, with intention, placed its design upon the writing. What the decedent wrote was not the involuntary reaction of mind to incident; it was a carefully prepared brief giving the writer's version of his relations with his daughter for a period of fourteen years. There was nothing natural or inartistic or undesigned about it. The writer could hardly have said more plainly that he anticipated a lawsuit either before or after his death—presumably after because the cast of the writing assumes that the writer will not be present in person to tell his story—and that the writing was by way of stating that which the writer desired to have accepted as the truth. Whether considered in its aspect toward the entire situation or narrowly with respect to

the imminent departure of the daughter to a new home, the statement was not a natural reaction to an incident, not a casual remark or notation reflecting the writer's frame of mind; it was a composition studiously framed for the purpose of persuading others to support him or his personal representative against a claim which he expected his daughter would make by legal action. The controversy had arisen. True, suit papers had not been prepared or served, but the writing was done against precisely that eventuality. The writer may have had a distorted mind, he may have been telling deliberate falsehoods, he may have been telling falsehoods believing them to be true, he may have been telling the truth; but what he said was said for the purpose of making evidence and was said outside of a court room, not under the solemnity of an oath, not with opportunity to his adversary for cross-examination, not in the presence of death, not spontaneously in response to an exciting cause; in a phrase, not with any of those credentials which an adverse litigant is ordinarily entitled to expect by way of authentication before testimony is admitted against him.

In *Hunter v. State,* 40 *N. J. L.* 495 *(E. & A.* 1878*),* Chief Justice Beasley approves the language of Wharton *(page* 538*):* "The *res gestae* may therefore be defined as those circumstances which are the undesigned incidents of a particular litigated act * * * not produced by the calculated policy of the actors"; and again, *at page* 540, he justifies the admission of the declarations there under consideration as "the natural and inartificial concomitants of a probable act, which itself was a part of *res gestae.* In such a status of the evidence, I should think that the exception to the principle that rules out hearsay had been carried to its extreme limit, but without transcending such limit". Affirmation or restatement of the rule in whole or in part will be found in many of our reported cases *inter alia; State v. Kane,* 77 *N. J. L.* 244 *(Sup. Ct.* 1909*); Murphy v. Brown & Co.,* 91 *N. J. L.* 412, 416 *(Sup. Ct.* 1918*); State v. Ehlers,* 98 *N. J. L.* 236, 246 *(E. & A.* 1922*); State v. Doro,* 103 *N. J. L.* 88, 94 *(E. & A.* 1926*); Slayback Van Order Co. v. Eiben,* 115 *N. J. L.* 17, 21 *(Sup. Ct.* 1935*); State v. Metalski,* 116 *N. J. L.* 543, 554 *(E. & A.* 1936*); State v. Then,* 118 *N.*

J. L. 31, 38 *(Sup. Ct.* 1937*); State v. Stephan,* 118 *N. J. L.* 592, 602 *(E. & A.* 1937*); Rainess v. Grant Finishing Co., Inc.,* 133 *N. J. L.* 611 *(E. & A.* 1945*); Kupfersmith v. Law, &c., Insurance Co.,* 80 *N. J. L.* 432, 435 *(E. & A.* 1910*).* In *Kelly v. Pitney,* 98 *N. J. L.* 773 *(E. & A.* 1923*),* the decedent had made a will wherein he made gifts to two domestics provided they were in his employ at the time of his death and his later notation upon the envelope containing the will that the persons had left his employ on the day of the notation was held admissible But that was little more than the equivalent of a bookkeeping entry. As the court observed: "It * * * was the natural thing for the testator as a business man to do in the circumstances", and again, quoting Wigmore on Evidence: "The statement *. * * must appear to have been made in a natural manner and not under circumstances of suspicion". It is clear that the word "natural" was there used, as it was in the *Hunter case, supra,* in antithesis to the words "artificial" and "designed" and that the phrase "under circumstances of suspicion" has the meaning communicated by Chief Justice Field of the Massachusetts Supreme Judicial Court in *Commonwealth v. Trefethen,* 157 *Mass.* 180, 31 *N. E.* 961, 966 *(*1892*),* in this language: "and the declaration if made, was made under circumstances which exclude any suspicion of an intention to make evidence to be used at the trial". See, also, *Schloss v. Trounstine,* 135 *N. J. L.* 11, 14 *(Sup. Ct.* 1946*).*

The complainant twice attempted in the course of the hearing to testify to the transaction sued upon and was each time barred on defendants' objection grounded in R. S. 2:97–2, which provides that " * * * when one party sues or is sued in a representative capacity, no other party thereto may testify as to any transaction with or, statement * * * by the decedent unless * * * the representative of the decedent offers himself as a witness on his own behalf and testifies to any transaction with or statement by his testator, intestate * * * in which event the other party may be a witness on his own behalf as to all transactions with or statements * * * by the decedent, which are pertinent to the issue * * *". Defendant Hackensack Trust Company is the tes-

tator's executor. No officer or employee of the executor became a witness. The disputed paper came in as an exhibit by reason of a question asked of complainant by the defense whereby she was called upon to identify the writing of the signature as the handwriting of her father. The design of the legislation "is to produce equality between the parties to such a suit, by silencing the one who may, by his own mouth, be able to testify to transactions and conversations with the decedent, possibly to the disadvantage of his estate, unless the representative of that estate should, by his own conduct, remove the interdict". *Woolverton v. Van Syckel, 57 N. J. L. 393 (E. & A.* 1894). The defendants' objection was well grounded in the statute and the Vice Chancellor properly excluded the complainant's testimony. While the admission of decedent's written statement destroyed the reason for the inhibiting statute, it did not furnish the statutory exception to the inhibition. We do not know whether the testimony which complainant, if permitted to testify, could give would have presented a different factual picture, but a rule of law which would admit her father's account of the transactions between him and her and at the same time exclude her account seems to be inequitable. Whether or not this of itself would be sufficient to bar the defendants from introducing the declaration, it points to one of the difficulties, and suggests others, in the way of a judicial wrenching of a single rule of evidence from its accepted position with relation to the general field of law on that subject.

We consider that the admission of the disputed paper was contrary to the holdings in this state and to the great body of juridical holdings throughout all of the jurisdictions, and that it constituted error; not, however, harmful or reversible error, because, as we find, the complainant did not carry the burden of proving the making of the alleged contract and her performance of what she conceded to be her obligations under the alleged contract.

The decree below will be affirmed, with costs.

VANDERBILT, C. J. I concur in the conclusion of the majority of the Court that the complainant has failed to prove her

contract by the test demanded in equity and that, even if she had, her own proofs disclose that she has failed to perform her part of the alleged contract.

I do not agree, however, with the majority in their holding that the testator's statement of September 12, 1942, which is set forth at length in the opinion of the Court, is inadmissible. The complainant appealed from the ruling of the learned Vice Chancellor admitting the statement in evidence and there is nothing in his opinion or elsewhere in the record to show that he did not use the exhibit in reaching his conclusions. The question is therefore squarely raised as to the propriety of his ruling in admitting it in evidence.

It is significant that every witness in this case except the complainant—seven for the complainant and three for the defendants—all testified to conversations with the testator, some of them as remote as 1931, and all of them casual and sketchy. The fundamental question is whether it would be sound to accept such dubious testimony, and at the same time to exclude the explicit written statement of the testator whose lips are sealed by death and whose evidence will otherwise be lost, particularly when, as in this case, most, if not all, of the facts which he alleged in his written statement are susceptible of ready and convincing refutation if they are untrue. Competent witnesses might easily be produced by the complainant to negative any untrue statement of the testator that he had paid all of the expenses of the household at Nyack, that he had given her an automobile, supplied her with the funds for two trips to California and for summer vacations at the Jersey shore, paid for her wearing apparel for ten years, and that she had never accounted for the rents she collected under a power of attorney on 342 Main Street, Hackensack, N. J., that she had called in two attorneys on her own initiative and forced him to sign a will, etc. If his statements on any one of these points were demonstrated to be untrue, the maxim, *falsus in uno, falsus in omnibus* would clearly be applicable to destroy the force of his entire statement. While there is not the slightest suggestion of perjury in the instant case, one does not have to have had much experience in the courts to

be keenly aware of the dangers which are inherent in the situation where the best available testimony of one side is excluded by an artificial rule of evidence. Not only did the complainant have every opportunity to produce witnesses on her own behalf to refute the decedent's written statement, but here she herself should not be barred by R. S. 2:97–2 from testifying to the facts, as she would have been if the statement had not been introduced in evidence.

The entire history of the law of evidence has been marked by a continuous search for more rational rules first as to the competency of witnesses and then as to the admissibility of evidence and by and large this growth in the law of evidence has come through judicial decisions. Many types of witnesses whose testimony was formerly rejected by reason of their being parties to an action or related to parties to an action are now freely permitted to testify. Many kinds of evidence which a century ago would have been excluded under the hearsay rule are now everywhere admitted in evidence in the light of an increasingly rational consideration of the probative value of such testimony on the one hand and the opportunity to test its validity on the other hand. The sound approach is that indicated by Mr. Justice Sutherland in the well known case of *Funk v. United States*, 290 U. S. 371, 54 S. Ct. 212, 78 L. ed. 369 (1933), in rejecting the commonlaw rule precluding a wife from testifying in favor of her husband in a criminal trial (290 U. S. 371, 381–383):

"The fundamental basis upon which all rules of evidence must rest— if they are to rest upon reason—is their adaptation to the successful development of the truth. And since experience is of all teachers the most dependable, and since experience also is a continuous process, it follows that a rule of evidence at one time thought necessary to the ascertainment of truth should yield to the experience of a succeeding generation whenever that experience has clearly demonstrated the fallacy or unwisdom of the old rule.

" * * * That this court * * * in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist we think is not fairly open to doubt."

* * *

"To concede this capacity for growth and change in the common law by drawing 'its inspiration from every fountain of justice', and at the

same time to say that the courts of this country are forever bound to perpetuate such of its rules as, by every reasonable test, are found to be neither wise nor just, because we have once adopted them as suited to our situation and institutions at a particular time, is to deny to the common law in the place of its adoption a 'flexibility and capacity for growth and adaptation' which was 'the peculiar boast and excellence' of the system in the place of its origin."

The reason for recognizing a new exception to the hearsay rule dealing with a decedent's declarations was admirably stated by Dean Wigmore in drafting the report of the Committee of the American Bar Association on Improvements in the Law of Evidence:

"The hearsay rule, requiring that all testimonial assertions be subjected to the scrutiny and test of cross-examination, and therefore excluding all statements made out of court and not so tested, is a most valuable rule, being one of the great contributions of Anglo-American law for the methodical investigation of facts.

"But of course it has always had to recognize exceptions; There are a dozen or more of them, having large scope. Many or most of them are based on situations where the test of cross-examination is no longer practicable—the person being deceased or otherwise unavailable—and that therefore it is better to accept what can be got than to reject it entirely.

"The scope of these exceptions has been gradually enlarged, over the past century. And just 40 years ago (1898) the State of Massachusetts (at the instance of Professor James Bradley Thayer, known as the greatest authority on the law of evidence) undertook to make another enlargement, viz., to admit in general the declaration of a deceased person who had had personal knowledge and spoke or wrote in good faith before controversy had arisen.

"This sensible statute was later made the subject of a thorough and pragmatic inquiry by the Commonwealth Fund Committee. (The Law of Evidence: Some Proposals for its Reform, by Morgan, et als., Yale Univ. Press, 1927 pp. 37–49). They sent out a questionnaire to Massachusetts lawyers, seeking answers from those who had had experience with the statute. Of those who had used it (or had it used against them) in from 100 to 500 cases the answers were unanimous that it did more good than harm; of those who had had less experience with it, some 80 per cent favored it as beneficent; while of those who had had no experience with it, some two-thirds favored it. Thus, the opposing opinions were in inverse relation to experience with it.

"The Massachusetts statute has given rise to virtually no technical trouble in interpretation, and it stands today as indorsed by 40 years of trial experience. (63 Rep. Am. B. A. 584; 1938)."

It is significant to observe that this recommendation, as drafted by Dean Wigmore, received the assents of members from 30

states and from 13 law schools to one dissent. The report was unanimously adopted in 1938 by the House of Delegates and the Assembly of the American Bar Association.

In the face of the almost unanimous approval by the judges and lawyers in Massachusetts after they had had an opportunity to observe the merits and defects in the operation of its liberalized rule for nearly half a century, and the reports and recommendations of our foremost authorities on the law of evidence, as well as our leading judges and lawyers, vigorously urging the general adoption of the Massachusetts rule, and in some instances the extension of the rule, it would seem unfortunate were we to reaffirm and carry on the obviously outmoded and circumscribed rationale of *res gestae* to test the admissibility of a decedent's declarations. At the very least, we may safely adopt the Massachusetts rule, encompassing as it does all necessary safeguards required for the reception of evidence of this type.

As has been so aptly stated:

"The needless obstruction to investigation of truth caused by the Hearsay rule is due mainly to the inflexibility of its exceptions, to the rigidly technical construction of those exceptions by the courts, and to the enforcement of the rule when its contravention would do no harm, but would assist in obtaining a complete understanding of the transaction.
"The next and needed step in the liberalization of the Rule is the adoption of the general exception for *all statements of deceased persons; leaving the application of the rule to the trial court.*" (5 *Wigmore on Evidence* (3rd ed. 1940 p. 1427.)

To sustain the admission in evidence of the statements in question, it is not necessary for us to go as far as the *Model Code of Evidence of the American Law Institute (1942):*

"Rule 503. Evidence of a hearsay declaration is admissible if the judge finds that the declarant (a) is unavailable as a witness, or (b) is present and subject to cross-examination."

In support of its rule the Institute has this comment:

"That a reported statement of a person who has perceived an event is ordinarily of less value than his testimony concerning it, given under oath and subject to cross-examination, no one will deny. If the report comes by a devious route, suspicion as to its value is increased. The validity of these truths is recognized in these Rules; they re-

quire that in most instances the declarant be produced as a witness if he is available. But these Rules do not, as the decisions do not, proceed on the assumption that hearsay is worthless; and they do recognize the undoubted fact that the common law rules, as evolved and developed in our many jurisdictions, have become so refined and complex as to require a complete and radical re-examination * * * (p. 217)

"The fact is, then, that the law governing hearsay today is a conglomeration of inconsistencies, developed as a result of conflicting theories. Refinements and qualifications within the exceptions only add to its irrationality. The courts by multiplying exceptions reveal their conviction that relevant hearsay evidence normally has real probative value, and is capable of valuation by a jury as well as by other triers of fact. This is further demonstrated by the majority view that inadmissible hearsay received without objection may be sufficient to sustain a verdict. Most statutes regulating procedure before administrative tribunals made hearsay admissible. And it is by no means clear that the administrative official ordinarily presiding at a hearing has more competence to value testimony than has a jury acting under the supervision of a judge. The number of cases tried before juries, as compared with the number tried before judges without juries and before administrative tribunals, is small indeed; and to make general rules based on a questionable distrust of the jury seems unwise. Consequently, these Rules greatly liberalize the common law." (pp. 223–224).

The Model Code of Evidence prepared by a distinguished committee of thirteen jurists and professors under the chairmanship of Professor Edmund M. Morgan of Harvard, with the aid of an equally distinguished group of 68 consultants drawn from the bench and the list of active practitioners at the bar and approved by the entire membership of the American Law Institute, is an authority that should be given attention in adapting the law of evidence to the needs of the times. See, *In re Petagno,* 24 *N. J. Misc.* 279 *(Ch.* 1946) where Advisory Master Van Winkle, in an appropriate case, urges and sets forth strong reasons for the early adoption by our courts of this rule.

The problem was presented as early as 1862 in the case of *Speer v. Speer,* 14 *N. J. Eq.* 240 *(Ch.* 1862). The question there involved was whether a conveyance made by a decedent during his lifetime to his son was a gift by way of advancement or as compensation for services allegedly rendered by the son. Chancellor Green held that statements by the decedent,

both *contemporaneous* with the conveyance and on various occasions *subsequent thereto,* were admissible in evidence to show the intent with which the conveyance was made by the decedent *(14 N. J. Eq.* 240, 248–249):

"It is further urged that the declarations of the father are incompetent evidence to prove an advancement. Where the declarations of the father are made at the time of the transaction they are clearly admissible as a part of the *res gestae.* Nor do I perceive any legal objection to declarations subsequently made. The declarations of the grantor subsequent to the date of the conveyance, to show fraud, or otherwise to invalidate the title of the grantee, are clearly incompetent. But as before said, the design of the evidence is not to impeach the title of the grantee. It is not offered to prove that the deed is fraudulent or inoperative, but to show the purpose or intent with which the deed was made by the ancestor to avoid injustice and effect an equality as between the co-heirs. Advancement is a question of intent, and may be shown by the declarations of the parent or the admissions of the child."

In later New Jersey cases oral or written declarations of a decedent, not otherwise qualifying under one of the then recognized exceptions to the hearsay rule, have been admitted in evidence where the intent or purpose with which a particular act was done by the decedent is a material inquiry and the declarations in question were contemporaneous with the doing of the act. A leading case is *Hunter v. State,* 40 *N. J. L.* 495 *(E. & A.* 1878), a murder case, where it was necessary for the prosecution to establish the presence of the victim with the accused. It was there held, in an opinion by Mr. Chief Justice Beasley, that oral statements made by the victim on the morning of the murder to the effect that he was going to Camden with the accused that night were admissible "on the single ground that they were the natural and inartificial concomitants of a probable act (going to Camden), which itself was a part of the *res gestae.*" *(40 N. J. L.* 495, 540.)

In *Kelly v. Pitney,* 98 *N. J. L.* 773 *(E. & A.* 1923), a written declaration of a decedent was admitted on the authority of the *Hunter case.* There decedent had bequeathed a gift to the plaintiff, a domestic, provided she was living and in the employ of the decedent at the time of his death. Some five years after executing his will the decedent closed his home

and went to live at the Essex Club, where he resided until his death. On the very day he closed his home the decedent wrote out and signed a statement on the envelope containing his will to the effect that the plaintiff had that day left his employ. The plaintiff sued to recover the legacy, and it was held that the written declaration of the decedent "was properly admitted to show with what intent and purposes he acted in paying off the plaintiff, closing his house, and moving elsewhere that day." The court set forth the rule in these words *(98 N. J. L. 773, 778)*:

"Where, as here, the state of mind or intent with which any particular act is done is a relevant fact and the subject of inquiry, declarations made by the person who does the act, and accompanying the act, and which illustrate or explain its character, are a part of the *res gestae*, and are admissible in evidence."

Here, as in the *Hunter case,* the holding was one of necessity; it stretches the scope of the none too elastic doctrine of *res gestae,* the only exception to the hearsay rule then believed available to permit the admission of the evidence there in question.

The exhibit in question in the instant case might well be admitted on the authority of the cases herein cited as an exception to the hearsay rule under the *res gesta*e doctrine as showing the state of mind of the testator in refusing the complainant's invitation to him to move to Cincinnati with her and her husband. But Wigmore has pointed out the difficulties which the application of the *res gestae* doctrine has caused in excluding evidence and in admitting it *(6 Wigmore on Evidence § 1726(2) )*:

"In a number of precedents *sundry declarations of intention* (to make a journey, to pay money, or the like) have been excluded, usually without any other apparent reason than the supposed application of the 'res gestae' *doctrine (post, § 1772).*

"That doctrine, indeed, has also in some of the rulings admitting this evidence *(ante, § 1725)* been taken as the source of admissibility. *It would be well if the invocation of the 'res gestae' doctrine in this connection could be wholly abandoned. The simple and sufficient reason for admission is the Hearsay Exception receiving statements of an existing mental condition.* Whether these accompany some conduct relevant in the litigation, or any movement or 'act', is wholly immate-

rial. The labor shown in certain judicial opinions to discover some 'act' of which the declarations 'are a part' is wasted; such speculations serve only to confuse an otherwise simple situation. For example, Doe is said to have been killed on Friday at Millville; to show that he was there on Friday, a design on Thursday to go there on Friday is relevant (*ante*, § 102). His declaration on Thursday of such a design, if made under circumstances of naturalness, is admissible; and it cannot make any difference whether, as in the Herrick case (*ante*, § 1725), he uttered it in the 'act' of leaving the house, or whether as he sat reading the paper, he said to his wife, 'I see that Roe in Millville has failed; I shall go down there the first thing tomorrow morning.' The departure from the house is no more a material 'act' in the case than the reading of the newspaper; it might as well be argued that, if he wiped his forehead and said, 'it is so hot that I shall run down to the seaside tomorrow,' the wiping of his forehead was an 'act' which his declaration characterized. An examination of the doctrine of Verbal Acts (*post*, § 1772) will show that its correct application gives no sanction to its use in the present connection. The sooner this doctrine is left to its own legitimate sphere, the better. Its invocation to determine the admissibility of declarations of design or plan serves only to confuse a simple question, and to narrow a broad and useful rule."

The *Hunter case* is appropriately cited by Wigmore as authority not for the *res gestae* rule, but for the exception to the hearsay rule, just alluded to. Thus, on a proper analysis the cases in the court of last resort in New Jersey, as Wigmore has so clearly shown, are not to be justified under the *res gestae* rule but by the exception to the hearsay rule as to declarations of an existing state of mind.

It will serve no useful purpose to analyze all of the New Jersey cases cited in the majority opinion. They either involve the correct application of the *res gestae* rule and as such are beyond criticism, or they follow the lead of the *Hunter case* in applying the *res gestae* rule in situations where, as Wigmore has so clearly shown, the *res gestae* rule has no proper application.

In the present case we are concerned with a written document signed by the decedent, and we have no occasion now to go beyond its requirements. An analysis of the decisions in our State herein referred to furnishes us ample authority for the admission of the statement in question under the exception to the hearsay rule receiving statements of an existing state of mind and accords with the trend of modern scholarship in this

field. It is for the trial court to decide preliminarily that the writing was made in good faith before the beginning of the suit and upon the personal knowledge of the declarant. It is likewise for him to determine what weight is to be given to it, when sitting as a trier of the facts, and to give appropriate instructions thereon, where there is a jury. I am of the opinion that the document in question was properly admitted in evidence.

I am authorized by Mr. Justice WACHENFELD to state that he joins in this opinion.

*For affirmance:* Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON—6.

*For reversal:* None.