44 N.J. Super. 507 (1957)
131 A.2d 20
STEPHEN P. APPELGET, EXECUTOR OF THE ESTATE OF JAMES G. APPELGET, DECEASED, PLAINTIFF,
v.
VINCENT E. VAN HISE AND ETHEL VAN HISE, HIS WIFE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 4, 1957.
*511 Mr. Philip M. Chamberlin, attorney for plaintiff.
Mr. Henry G.P. Coates (Messrs. Turp and Coates, attorneys), attorney for defendants.
CONFORD, J.A.D. (temporarily assigned).
This is an action by the executor of the estate of James G. Appelget, deceased, to foreclose two certain real estate mortgages, one executed in 1946 for $19,000, upon which $17,500 and interest is asserted to be due, the other in 1954 for $40,000, on which $38,800 and interest is claimed due. There are joined in the complaint counts on several notes and loans on which defendants are said to be obligated to the estate for several thousand dollars and one on a guaranty by the defendant Vincent E. Van Hise of a note to the decedent made by his brother, Vernon Van Hise, and his wife, for $1,800, on which $981.96 plus interest is said to be due the estate. The principal matter in dispute is the continued subsistence of the 1946 mortgage debt. Defendants contend it was discharged in the transaction culminating in the making of the 1954 mortgage by inclusion of any balance *512 thereon in the $40,000 debt for which the 1954 mortgage was given.
In the answer filed by defendants, while liability on the $40,000 mortgage is admitted, interest is disputed on the ground that the decedent excused payment of installments of principal "because they would be taken care of when he was gone." The answer includes a counterclaim asserting that over a period of years from 1941 until the decedent's death in 1955 the defendant Vincent E. Van Hise rendered extensive farming services on the decedent's farm and cleared woodland thereon for and at the request of the decedent, for which the estate owes him the reasonable value thereof, stated to be $17,120, and interest. A second count in the counterclaim alleges a verbal agreement between Vincent Van Hise and the decedent whereby the former was to work decedent's farm and have the proceeds of the 1956 crops, less taxes and insurance. It is contended plaintiff prevented the harvesting of the crops by Van Hise and judgment is sought for their value.
A general exploration of the background of the association of James G. Appelget, the decedent, with the defendant Vincent E. Van Hise will illuminate the conclusions of the court both on the facts and the law. Appelget was 69 at his death. Van Hise appears to be in his forties. Their association in a business sense began in 1941 when they entered into a share-cropping agreement whereby Van Hise raised potatoes on Appelget's 46-acre farm on the outskirts of Hightstown. This arrangement continued until 1951. In the interim the acreage devoted to potatoes decreased somewhat and Van Hise soon began, in addition to the potatoes, to raise various other crops on Appelget's land for the latter's benefit, using his own machinery and providing additional labor at his own cost and expense. There is no contention by defendants that these services were ever the subject of any express agreement or understanding as to compensation, as in the matter of the potatoes.
All during this period Van Hise's principal occupation was the operation of a dairy and grain farm of his own, *513 first in Cranbury, and, since 1944, in Clarksburg, Allentown. His present farm, which is encumbered with the mortgages involved in this litigation, is 210 acres in area. He keeps about 40 cows, has one steady helper and in seasonal necessity hires additional hands. In acquiring this farm in 1944 he was financed by a bank mortgage to the extent of $17,500. The $19,000 mortgage to Appelget in 1946 was for the principal purpose of refinancing the bank mortgage. Defendants offered proof through Van Hise's father that it was Appelget's idea to do this and that it was deemed beneficial to Van Hise for Appelget to carry the mortgage rather than the bank.
Appelget's will, under which plaintiff, his brother, is serving as executor, was made February 14, 1941. It left a life interest in the residue of the estate to his wife, remainder to his six brothers and sisters. His wife died several years later. Thenceforward his association with Van Hise ripened into a close friendship, a relationship almost paternal. He was known to Van Hise as "Uncle Jim." The record is replete with evidence of his fond regard for the younger man. He expressed this feeling to a number of others over the years. It was reciprocated. In 1946 Van Hise named his only son after Appelget. While Van Hise unquestionably rendered valuable services to the decedent, so did the latter for Van Hise, within his more limited capacity. He helped to remodel Van Hise's farmhouse and to plan the foundation for a new feed room, he mixed cement for a new silo, raised calves for Van Hise on his own farm, visited him frequently and advised him generally. Of most significance in a material sense, he stood ready at all times to finance Van Hise, and, as will appear, he did so frequently and generously, even to the extent of borrowing on occasion for the purpose. In his last illness Van Hise attended him like a son. I am convinced Appelget intended ultimately to relieve Van Hise of the mounting burden of indebtedness which his fondness for the man had permitted to grow beyond Van Hise's capacity to carry it. But he never actually *514 did, nor bound himself legally to do so, so far as the evidence in the case permits me to find.
I proceed to the specific issues to be determined.

1. As to Payment of the 1946 Mortgage

The question to be determined here is whether, when decedent advanced fresh moneys to or on behalf of Van Hise in or about October 1953 and took a $40,000 note and chattel mortgage from him, followed by a $40,000 bond and real estate mortgage as additional security in January 1954, the debt on the $19,000 1946 mortgage was discharged in the course of the transaction. Plaintiff concedes that $1,500 was paid on the 1946 mortgage prior to the 1953 refinancing, but nothing then or since.
Both the chattel mortgage transaction in October 1953 and the real estate mortgage in January 1954 were handled by attorney Robert E. Dietz, since deceased, reputed to have been a careful and experienced practitioner in such matters. The evidence is that he was acting for both parties and that his bills for services were paid by Van Hise. A "Mortgage Settlement Statement" dated October 26, 1953, prepared by Dietz and signed by the parties, shows as debits against a credit of $40,000:

 "Debits
 Amount due James Appelget on notes
 and interest thereon ............................ $18,081.88
 Check to Robert E. Dietz for the
 account of Vincent Van Hise ..................... 21,918.12
 __________
 $40,000.00"

A "Chattel Mortgage Settlement Statement" prepared and dated the same day shows a breakdown of the $21,918.12 aforementioned to cash disbursed by Robert E. Dietz, $1,805.03 to the Van Hises, and the remainder in various amounts to nine creditors of Van Hise, some of whom held recorded liens on Van Hise chattels and farm equipment, which were forthwith discharged and cancelled.
*515 The crucial question is obviously the identity of the $18,081.88 component of the new $40,000 mortgage debt referred to above. Was this, as apparently argued by defendants, the principal balance on the 1946 mortgage, or rather, as contended by plaintiff, did it consist of interest thereon and subsequently created obligations?
It is noteworthy that the earlier bond and mortgage were never delivered up for cancellation. Defendants explain this on the basis that Appelget neglected to bring the instruments in at the October 1953 closing and promised to do so later. Dietz' then secretary testified in their behalf that Dietz had told her that the 1946 mortgage was to be cancelled. Van Hise was prevented from testifying to any phase of the transaction by sedulous invocation by plaintiff of the bar of the statute against testimony by a party to any transaction with a decedent represented in the action. N.J.S. 2A:81-2. Defendants emphasize that a pencilled memorandum prepared in connection with the transaction by Dietz recites: "To discharge existing liens." But this more probably refers to personalty liens than real estate liens, as the remainder of the contents of the memorandum is almost entirely a list of existing conditional sales and chattel mortgage liens.
Defendants' version was also supported by the testimony of one Max Zaitz, a local cattle dealer who knew both Appelget and Van Hise well. He has occasionally sold Van Hise cattle. At the time of the 1953 Van Hise refinancing, Van Hise owed him $4,750. He loaned Appelget $6,000 to assist in the refinancing, was paid off the $4,570 in the refinancing closing, and was repaid the $6,000 in December 1953. Appelget borrowed $7,000 from another friend just about the time he repaid Zaitz. The latter testified that the decedent had discussed Van Hise's affairs with him about a month before the refinancing transaction and told him "it was going to involve around $30,000" to put "Vincent's" debts "all in one." Later in the examination, in response to leading questions, he said Appelget told him that the $30,000 would represent everything owing to him, including *516 the original mortgage debt. He also testified that they had another conversation when the $6,000 loan was repaid in which Appelget told him what security he had with Vincent and asked him whether he considered it adequate. Zaitz said he did not, and a few days later Appelget saw him again and said he had gotten it "fixed up" with "another mortgage."
Militating against the hypothesis erected upon these proofs, however, are the following circumstances. Dietz represented both parties. It is difficult to believe a conscientious lawyer would permit a client's property to remain encumbered of record with $59,000 in mortgage liens indefinitely when he owed only $40,000. Assuming Dietz was willing to give Appelget time to bring in the old instruments for cancellation as of the October 1953 closing, how does one account for his continued failure to insist upon their cancellation when Van Hise executed the real estate mortgage in January 1954? Moreover, it would appear from Zaitz' testimony, if believed, that when the chattel mortgage was taken in October there was at that time no intention that a realty mortgage also be given (Zaitz having said it was he who later gave Appelget the idea of taking the realty mortgage). It hardly seems likely that Appelget, a careful business man, would have under those circumstances agreed, as testified by Dietz' secretary, to cancel the prior real estate mortgage and thus leave himself secured for a $40,000 obligation with only a chattel mortgage.
But the almost conclusive case against defendants' position in respect to this issue is found in evidence consisting of Van Hise's own writings. I refer to exhibits in evidence P-14, P-15 and P-16. The first two are the second and third pages of a notebook found among the decedent's papers. Plaintiff testified that Van Hise admitted to him the entries were in his handwriting and were a record of his mortgage payments. Van Hise never denied this admission. They show a breakdown of three payments, $639.58 on November 24, 1953, $637.91 on December 28, 1953, and *517 $636.24 on January 26, 1954. In each case $400 is listed as a payment of principal on $40,000, while payments of $166.67, $165.00 and $163.33, respectively, are listed for the stated dates as "Int. on Mtg" under the heading, $40,000; and $72.91 is listed as a payment for each date as "Int on Mtg" directly under the heading, $17,500. Calculation will reveal that the amounts shown as interest represent interest at the stipulated rate of 5% for the periods in question on principal obligations of $40,000 and $17,500, respectively. Van Hise did not deny making these entries but undertook to explain them as including principal and interest on a 1952 obligation to Appelget of $200 supposedly overlooked in the October 1953 general settlement. I cannot credit this explanation in the face of his own written allocation of the payments to interest under both a $40,000 obligation and a $17,500 obligation. Moreover, the first page of the notebook in question contains a heading "57,500 V Van Hise 1953 Oct 26, 1953" and a notation of a payment on November 24, "principal 400 and interest 239.58," all satisfactorily identified as in the handwriting of the decedent. That figure, as may be inferred from what has been stated, is the result of computing interest for one month at 5% per annum on $57,500. The page mentioned was marked in evidence, over objection, provisionally, as Exhibit P-12, subject to reconsideration. For reasons which will be set forth presently, I regard this page as admissible as a declaration against pecuniary interest. But in any case it would be material and competent as bearing upon the significance of the admissions reflected by the entries in the very next two pages of the same book. It is readily inferable, and I find as a fact, that Van Hise undertook in the subsequent pages of the book to break down the interest items which he knew the decedent had set forth on the first page.
The evidential status of Exhibit P-12 involves an application of the rule as to declarations against interest which is to some extent germane also to the competency of another disputed memorandum of the decedent in this case, admitted as Exhibit P-20, and discussed in "5" hereinafter. *518 The objections to these exhibits by defendants were based upon the contention that were the decedent alive and suing in propria persona such memoranda would be inadmissible as hearsay and self-serving. Jackson v. Pioneer Adhesive Works, Inc., 132 N.J.L. 397, 401 (Sup. Ct. 1945). So far as the argument goes it is sound. Nor would they qualify as records made in the regular course of business. N.J.S. 2A:82-35. Of course, the mere fact that the author of a written statement or memorandum is deceased will not of itself render an otherwise incompetent paper admissible. Robertson v. Hackensack Trust Co., 1 N.J. 304 (1949). Distinguish the case where such a statement is classifiable as part of the res gestae or as indicating a mental condition reflecting a plan or design. Schloss v. Trounstine, 135 N.J.L. 11 (Sup. Ct. 1946).
Yet it is a commonplace that evidence not admissible under one approach may be competent under another, and, if so, will be received in that capacity. And here, referring particularly to the decedent's entry in his notebook, I conclude the exhibit is admissible as a declaration against interest. A statement of a fact which was known to the declarant and was at that time against the declarant's pecuniary or proprietary interest will be admitted in evidence as an exception to the hearsay evidence rule if the declarant is deceased or otherwise unavailable at the time of the trial. 5 Wigmore on Evidence (3d ed. 1940), § 1455, pp. 259 et seq. The exception is based upon the concept of trustworthiness inherent in the conflict of interest and is justified by the necessity arising from the unavailability of the declarant. Clearly, the facts of receipt of an installment of principal debt and of interest thereon and of decedent's notation of such facts in writing were against the pecuniary interest of the decedent in the common acceptance of that phrase. Wigmore, op. cit., supra, § 1466, p. 273. Christopher v. Wilkins, 64 N.J. Eq. 354, 357 (E. & A. 1902). Wigmore stresses that it is the fact stated which must be shown to be against interest, rather than the making of the declaration. Another authority points out *519 that the rationale of many of the American cases is that the making of the statement by the declarant is against his interest, not necessarily the facts stated. Jefferson, "Declarations Against Interest: An Exception to the Hearsay Rule," 58 Harv. L. Rev. 1, 13 (1944). For a brilliant exposure of the inconsistencies in the cases, English and American, in application of either rationale, see Morgan, "Declarations Against Interest," 5 Vanderbilt L. Rev. 451 (1952).
The question arises as to whether a declaration otherwise within the rule is nevertheless inadmissible if in aid of the cause of a successor in interest to or one in privity with the declarant. While there is a holding to that effect in one New Jersey case, Shields v. Ivey, 52 N.J.L. 280 (Sup. Ct. 1890), the effect of a later decision of the Court of Errors and Appeals, which does not, however, discuss the point or cite the earlier case, is to the contrary. Christopher v. Wilkins, supra. There the personal representative of a deceased mortgagee was permitted to refute the defense of statute of limitations in a suit to foreclose the mortgage by introducing endorsements by the decedent of receipt of interest payments on the bond effective to toll the running of the statute. There are no later pertinent cases in this State, but there does not seem to have been any question in England concerning the availability of the rule in favor of the declarant's representatives. Taylor v. Witham, 3 Ch. D. 605 (1875), by Jessel M.R., a strong example in point, has been criticized, but not in the connection here under discussion. Morgan, op. cit., supra (5 Vanderbilt L. Rev., at p. 459). Cf. Jefferson, op. cit., supra (58 Harv. L. Rev., at pp. 44, 45). Wigmore is unqualifiedly to the effect that "the statements may be used in any controversy, without regard to the parties concerned" (italics the author's); op. cit., supra (§ 1459, p. 265). And there is no proposed limitation of use in this sense either in the Model Code of Evidence (Rule 509), or in the Uniform Rules of Evidence (Rule 62(10)). I conclude the law of this State contemplates that the successor in interest of the declarant *520 may avail himself of the benefit of a declaration against interest to the same extent as any one else.
The final presently critical inquiry is whether the self-serving aspect of the declaration at the time when made does not outweigh its disserving character so as to impel its rejection. In the present instance the declaration aided the declarant in tending to establish the debt to be $57,500. Does that fact so derogate from its trustworthiness as a disserving acknowledgment of a payment on the obligation as to compel its rejection? In the Taylor case, supra, it was stated that such circumstances would only go to probative weight, not competency (3 Ch. D., at p. 607). Wigmore poses but does not answer the question as to whether, in such case, a balance should be struck between the opposing interests and the statement admitted only "if on the whole the disserving interest preponderates in probable influence," op. cit., supra, § 1464, p. 270. The trouble with application of such a criterion is that the answer to the question sometimes, as here, requires a preliminary determination of the very issue in litigation. If, for example, in the present case, $57,500 was not in truth owing the decedent, or there was a question about it, the self-serving aspect of the declaration is obviously paramount. See Morgan, op. cit., supra (5 Vanderbilt L. Rev., at p. 458). The Model Code of Evidence of the American Law Institute would admit such parts of the declaration "as the judge finds to be so closely connected with the declaration against interest as to be equally trustworthy." Rule 509(2). In my judgment the question of admissibility must be left to the discretion of the trial judge based upon his appraisal of all the circumstances surrounding the making of the declaration. It should be for him to say, preliminarily, whether a substantial residuum of trustworthiness survives the potential concurring adulteration by self-serving interest.
In the present case the continuing close relationship between Appelget and Van Hise at and after the making of the 1954 mortgage repels any inference of a motive on the part of Appelget to create evidence, particularly false evidence, *521 against Van Hise, in noting the first payment on account of the mortgage debt after its recasting. The exhibit impresses me as trustworthy. I remain of the view that it is competent as a declaration against interest.
If any doubt yet remains as to whether the original mortgage obligation survived the 1953 settlement, it is dispelled by Exhibit P-16. This was satisfactorily established to be a list of figures prepared by Van Hise, apparently some time in the summer of 1953 and in preparation for the 1953 refinancing, and written by him on the back of an envelope in the Appelget home. It shows a list of obligations, one of which is "Int. due on Mortg. to June 16, 1953, $4083.34  $1750 Bal. $2333.34." The only mortgage then open was the $19,000 1946 mortgage. Other items are listed, and there is a totalling of the figure $15,318.34, labelled "Notes, Int on Mort. & Int on notes" and the figure $17,500, labelled "Mogage" (sic) to show a sum of $32,818.34. If the latter total is added to the $21,918.12 of fresh money advanced by decedent to or on behalf of Van Hise in October 1953, we derive an aggregate of $54,736.46, which is not far short of the $57,500 which plaintiff contends defendants owed Appelget on October 26, 1953.
In a foreclosure action the burden of proof of payment or other satisfaction of the mortgage debt rests upon the obligor. Kushinsky v. Samuelson, 142 N.J. Eq. 729 (E. & A. 1948). That burden was not carried by defendants. I find the mortgage debts aggregated $57,500 as of October 26, 1953 and that the obligation was reduced only to the extent of three $400 payments made, respectively, November 24 and December 28, 1953 and January 26, 1954. There was therefore due from defendants to plaintiff on the mortgages, in respect of principal, the aggregate of $57,500 as of October 26, 1953, and $56,300 as of January 26, 1954.
Brief reference should be made to an amendment of the answer by recital in the pretrial order to the effect that the amount due on the $40,000 mortgage should be deemed fully paid "on the ground that defendants fully performed *522 all acts expected by decedent of them in the farming of decedent's farm over a period of years." What this means to assert in legal terms is hard to say, but if it is intended to allege an agreement that the mortgage was to be discharged in consideration of previous and prospective farming services by Van Hise there was utterly no proof of such an agreement.

2. As to Interest on Mortgages

Defendants claim to owe no interest on the $40,000. Their "factual contention" as stated in the pretrial order is:
"Defendants admit that money is due on the bond and mortgage in 1954 for $40,000.00 but state they were led to believe after three installments were paid that they need not continue payments, based on representations made by decedent to them that the debt would be forgiven at his death."
The "legal contention" stated in the order is:
"Decedent made representations to the defendants concerning the payment of the $40,000.00 mortgage which defendants relied upon in not continuing their installment payments, which they were otherwise prepared to pay, and decedent also made other representations over a period of years whereby defendants performed farm services for the decedent without recompense, the defendants having relied upon the statements of the decedent, for which services they should be compensated as an equitable matter. Defendants should not be required to pay interest accrued as a result of their reliance on decedent's representations."
These statements are a confusing admixture of the defense to the claim for mortgage interest and the counterclaim for services. The discussion at this point of this opinion will be concerned only with the matter of interest. While the record contains a long array of alleged comments by Appelget to various people of his regard for Van Hise and of implications of intentions or plans to do substantial things for him, the only such statements presently material are those made after the 1953 mortgage was made. What Van Hise himself would have testified to in that connection, if anything, we do not know, as the statutory objection was steadfastly maintained *523 by plaintiff. But the testimony of the other witnesses affords a clue. Van Hise's father testified that Appelget told him in Vincent's presence shortly before Appelget went to the hospital in 1955 that his will was made and "Vincent was going to have the farms" and that he was going "to fix it so that nothing was on it" (the mortgages?); also, a year or so previously, when Vincent was hurt in an accident, that he "was going to take care of" him. Appelget repeated statements made in prior years to the elder Van Hise: "You take care of your other two sons, I'll take care of Vincent." I need not recount other similar testimony by other witnesses. None of it, even if believed, constitutes evidence of an agreement binding on the decedent or the estate to forego the right to the collection of installments of principal when due or to the stipulated interest on the mortgage. Appelget may have indulgently refrained from demands or pressures upon Van Hise to make payments on the mortgage in view of the fact that he was finding it necessary to lend him even more money after the 1953 mortgage was made, but this is far from an agreement binding himself to forego his lawful due on the mortgage (or the previous mortgage, for that matter). Moreover, some of defendants' supporting proofs as to these statements (and this applies as well to those allegedly made in the years prior to 1953) were attended by obvious bias for and sympathy with Van Hise on the part of the witnesses. The court may share their sympathy for defendants, but it cannot thereby be led to appraise the proofs with rose-colored glasses. Judging from the number and variety of the people with whom the decedent is purported to have discussed Van Hise, he told almost everyone with whom he had any contact over a period of years that Van Hise would be taken care of by him or would come into all of his property when he died. The sheer accumulation of so many such stereotyped recitals almost falls of its own weight, on ordinary criteria of credibility.
Proof of agreements of the kind here invoked, involving disposition of property at death or by will, consisting *524 of casual statements by a person since deceased, is scrutinized closely and will not be regarded as sufficient unless cogent, clear and convincing. Robertson v. Hackensack Trust Co., 1 N.J. 304 (1949); Yuritch v. Yuritch, 139 N.J. Eq. 439 (Ch. 1947); Richards v. Richards, 141 N.J. Eq. 579 (Ch. 1948); Ehling v. Diebert, 128 N.J. Eq. 115 (Ch. 1940), affirmed 129 N.J. Eq. 11 (E. & A. 1941); Turner v. Cole, 116 N.J. Eq. 368, 383 (Ch. 1934), affirmed 118 N.J. Eq. 497 (E. & A. 1935). I do not mean to imply that none of defendants' witnesses were intending to tell truly what they had heard. I merely conclude that the proofs as a whole show no more than a kindly and benevolent disposition on the part of the decedent toward Van Hise and that they fall short of establishing the claim that he bound himself in any way to forego any legal right he possessed against him.
Interest at the rate stipulated in each of the real estate mortgages will be allowed on the principal balances adjudicated as owing hereinabove, to run from January 26, 1954.

3. The Promissory Note for $2,582.60

The plaintiff has abandoned the fourth count of the complaint, conceding that the $2,500 loan referred to therein is integrated with the obligation on the promissory note for $2,582.60 dated March 1, 1954, upon which the third count is based. Defendants dispute $82.60 of this obligation, contending no more than $2,500 was advanced. While partial failure of consideration is a defense pro tanto as against the payee of a promissory note, R.S. 7:2-28, the burden of establishing the defense is cast upon the maker. Benjamin v. Blake, 121 N.J.L. 10, 12 (Sup. Ct. 1938). Defendants rely upon the fact that the only check which could relate to this note was one issued by the decedent to them on March 8, 1954 for $2,500. On the other hand plaintiff offered in evidence a sales slip of Tallman Bros. dated March 4, 1954 for calves bought by them from Van Hise on which there are extraneous notations in an unidentified *525 hand which appear to segregate the net price realized from sale of two of the calves, $82.60, and also a totalling of $82.60 and $2,500 to show a total of $2,582.60. From this evidence plaintiff argues that the odd $82.60 in the note represented calves belonging to Appelget which Van Hise sold to Tallman Bros. I consider plaintiff's proof too tenuous and that defendants have sustained the burden of showing they received and therefore owe only $2,500 on the note.
The note is payable on demand and contains no express provision for payment of interest. In such a case interest does not run until demand, or, if there is no express demand, until institution of suit. Knight v. Barnwell, 3 N.J. Misc. 1128 (Sup. Ct. 1925). No specific demand for the payment of this note prior to the institution of suit is here satisfactorily established by the plaintiff. Interest at the legal rate will therefore be allowed from the date the action was begun.

4. The $1,784.50 and $400 Loans

There is no dispute as to these items and it has been stipulated that defendants have paid $1,500 on account thereof. Judgment will be entered for the net balance due after allowance of the credit.

5. The Guaranteed Note for $1,800

The seventh count of the complaint is based upon a promissory note in the face amount of $1,800, dated January 18, 1949, executed and delivered by Vernon Van Hise, a brother of Vincent, and his wife, Elizabeth Van Hise, to the decedent, and guaranteed by the defendant Vincent E. Van Hise. Plaintiff says there is due and owing $981.96 on this obligation, and he seeks judgment for that amount, together with interest from December 3, 1952.
The Van Hise brothers assert this note was paid in full to the decedent by cash payments made from time to time *526 by Vernon to Appelget. Vernon said the last payment was in October 1954, in the sum of $463, being what Appelget advised him was the balance due. He did not ask for the note or get a receipt for the payment. Vernon testified that he could not give the particular dates and amounts of all the payments. He took only two receipts and did not ask for receipts on other occasions because Appelget "was marking it down." Many of his alleged payments were in cash. He mentioned a check for $400 given on December 3, 1952. Plaintiff admits that the $400 payment was made, relying upon a memorandum which plaintiff found among decedent's records and which he identified as being in the latter's handwriting. This was admitted in evidence as Exhibit P-20, subject to objection and reconsideration by the court. The memorandum is on a single sheet of plain, lined ledger paper, headed "Elizabeth [sic] Van Hise," and divided into columns, as of an account of payments for "principal" and "interest," showing an initial balance of principal due of $1,800 as of January 18, 1949. It showed 18 entries of payments of principal, some in pencil, some ink, apparently made at different times, and purporting to show dates of payment, nine in 1949, six in 1950, two in 1951 and one in 1952. Three $9 "interest" payments are shown as of February 19, 1949, March 19, 1949 and April 18, 1949, respectively. The paper has every appearance of authenticity as a private, currently kept record of the account on the loan. The total of the payments of principal indicated on it is $1,122.
This paper was objected to by defendants as self-serving and hearsay. I conclude that its admissibility can be justified as a declaration against interest under the controlling principles referred to earlier herein. But the particular purported evidential use of the paper here is novel insofar as my research into this branch of the evidence rule goes. It is submitted not for what it shows but for what it does not show, i.e., to establish that no payments were made on the loan other than those shown on the memorandum. If the paper is competent because it contains *527 statements against the declarant's pecuniary interest, I see no reason why it is not usable for any probative purpose for which its contents are logically relevant. Cf. Wigmore, op. cit., supra, § 1465, p. 271. The inference tendered by plaintiff is a possible one but I can accord the paper only limited weight toward that end. Decedent may have discontinued use of this very informal record for entry of payments on the loan since the last date noted on it. If later payments were made they might have been recorded elsewhere, or not at all.
But independently of the exhibit, I do not find from the proof that defendant has carried his burden of proving payment of the note. Kushinsky v. Samuelson, 142 N.J. Eq. 729 (E. & A. 1948). Vernon Van Hise's demeanor as a witness, in combination with the unlikelihood of his story substantively, particularly in respect to the explanations for not taking receipts for payments or possession of the note upon payment of the final balance, leads me to disbelieve him.
Notwithstanding that this obligation is a demand note, interest must be allowed thereon, as it appears to have been the intention of the parties that interest be paid. The memorandum of account of the decedent referred to (Exhibit P-20) shows three payments of interest. There being no other credible evidence as to the amounts and dates of payments, the computation will have to be made on the basis of that exhibit. But plaintiff's computation of $981.96 as due on principal as of December 3, 1952 was made on the here inapplicable principle that payments on account should first be credited against arrears of interest. While that is the generally followed rule for appropriation of payments, Holcombe v. Holcombe, 74 N.J.L. 257 (Sup. Ct. 1907), yet where a creditor chooses to accept a payment designated by the debtor as made on account of principal, he must so apply it. Benson v. Reinshagen, 75 N.J. Eq. 358 (Ch. 1909); see State v. Erie Railroad Co., 23 N.J. Misc. 203, 210 (Sup. Ct. 1945). Exhibit P-20 shows that the decedent accepted and applied to principal all the payments indicated thereon except the three $9 payments *528 indicated as being for interest. The computation of the balances of principal and interest due will therefore be made upon that basis.

6. The Counterclaim for Farming Services

Ordinarily proof of services rendered by one at the request of another under circumstances which negative the idea that they were gratuitous entitles the laborer to compensation in quantum meruit for their reasonable value. Colloty v. Schuman, 76 N.J.L. 502 (E. & A. 1908); per contra where "it may reasonably be inferred from the circumstances and conduct of the parties that no payment was to be made," Rubenstein v. Lopsevich, 4 N.J. 282, 285 (1950). I am perfectly clear that there was no intention or understanding between Appelget and Van Hise that the latter's farming services were to be paid for, as such. They were gratuitous. They were motivated by the fond personal relationship which had arisen between the two and the valuable financial and other aid rendered Van Hise by Appelget from time to time. Perhaps there was also a hope, and even expectation, of future beneficence. But this is not the basis for implying an agreement on the part of Appelget to pay the reasonable value of the services. Were there such an understanding, a natural occasion for its recognition or for a demand on the part of Van Hise for satisfaction of his claim was presented when Appelget arranged to refinance the Van Hise debts in 1953. Van Hise signed a note and two mortgages for $40,000 and said nothing about the services. The ruling will be for plaintiff on this count of the counterclaim.

7. The Counterclaim for the 1955-1956 Crop

I find that the services of the defendant Vincent Van Hise in connection with the 1956 grain crop (harvested in 1956, labor rendered in 1955) were of the same kind and general character, insofar as motivation for and circumstances surrounding their rendition is concerned, as in the previous *529 years. The present claim that the 1956 crops belonged to the defendants has no evidential support in the record whatever. It may be noted that the formal proof of claim rendered by Van Hise to the plaintiff as executor on May 14, 1956 includes work in the year 1955 on the same purported contractual basis as for the previous years. The ruling will be for plaintiff as well on this count of the counterclaim.
Plaintiff will submit judgment conformably with this opinion with consent of or on notice to defendants. There will be no costs.