May REGAN, Plaintiff,

v.

Joseph LENKOWSKY et al., Executors under the Last Will and Testament of Louis Lenkowsky, deceased, Defendants.

Civ. A. No. 28–54.

United States District Court
D. New Jersey.
Jan. 4, 1956.

Arthur C. Gillette, Newark, N. J., for plaintiff.

Rubenstein & Glick, Jersey City, N. J., by Bernard Glick, Hoboken, N. J., for defendants.

WORTENDYKE, District Judge.

Plaintiff, a resident of the State of New York, brings this action against the estate of Louis Lenkowsky, hereinafter sometimes referred to as "decedent". The executors are residents of the State of New Jersey. The amount in controversy is well in excess of the jurisdictional minimum in diversity cases.

The action is upon an alleged oral agreement between the plaintiff and decedent under which the plaintiff claims she was to render companionship and services by way of practical nursing care to the decedent in return for which the decedent was to make a bequest to the plaintiff that would provide her with an annual income of $7,000 as long as she should live. The decedent died without having made any provision in his will for the plaintiff. She filed a claim with the decedent's executors, and when that claim was rejected, she commenced this proceeding for damages for breach of the alleged agreement. The defendants denied the making of any such agreement as alleged. In addition, they set up several affirmative defenses attacking the validity and enforceability of the alleged agreement. After a jury trial, judgment was entered for the plaintiff in the amount of $133,204.40. Under Fed.Rules Civ.Proc. Rule 50, 28 U.S.C., the defendants seek to have this judgment set aside and to have judgment entered in accordance with a motion for a directed verdict made by defendants at the close of all the evidence. In the alternative, the defendants desire a new trial pursuant to Rules 50 and 59. The specific grounds for these motions will be referred to below.

The plaintiff is a beautician. A single woman, she has lived and worked in New York City the greater part of her life.

The decedent was a lumber and millwork company executive with active business interests to which he devoted himself up until the time of his death in August 1953 at the age of sixty-four. Prior to the death of his wife in April 1951, the decedent and his wife lived in Jersey City, New Jersey, but after her death the decedent took an apartment in North Arlington, New Jersey. For a considerable number of years before her death, the wife of the decedent had been an invalid. The decedent had four children, two sons and two daughters.

It is not questioned that the decedent and plaintiff were acquainted for some period of years. The fundamental matter at issue in this litigation is the nature of this relationship and the legal obligations, if any, arising therefrom.

The plaintiff was the principal witness at the trial. At the outset of her testimony, the defendants waived the provisions of a New Jersey statute which is designed to prevent a claimant against an estate from testifying as to transactions with or statements by the deceased. N.J.S.A. 2A:81–2. While other witnesses were called on the plaintiff's case, and several appeared for the defense, testimony concerning the status of the plaintiff and the decedent *inter se* came largely, if not almost exclusively, from the plaintiff. According to her testimony, she first met the decedent at a party in New York in 1941 or 1942. At that time the decedent was around fifty years of age and she was in her early thirties. Each was attracted to the other, and not too long after the initial meeting the result of this attraction manifested itself. In the first place, the decedent asked her if she would act as his hostess in entertaining business friends, a function which his wife, as an invalid, could not perform. This she agreed to do, because she had already grown very fond of him. In the second place, her fondness being reciprocated, she and the decedent engaged in intimate physical relations. Their intimacies occurred quite frequently throughout the remaining years of his life. At the same time, the decedent began to contribute regularly to the plaintiff's support. No fixed amount was involved and she never kept account of the moneys she received from decedent, but her recollection was that he gave her an average of $100 a month; however, it might have been more. Out of this amount she paid for telephone calls and other incidental expenses of the decedent, retaining the balance for herself. This financial arrangement lasted at least until 1951, but plaintiff did not indicate whether it continued until the death of the decedent. The decedent also gave her such gifts as a watch, a ring, a television set and a fur coat. During the course of a number of

years she devoted some of her time to matters in furtherance of the business interests of the decedent. She made telephone calls for him, wrote letters for him, attended dinner parties, made reservations for such affairs, secured theater tickets and handled parking fines incurred by the decedent. He came with some regularity to her apartment in New York City. After his wife's death, he continued to do so and she often went to see him at his apartment in North Arlington. Aside from this, she frequently accompanied the decedent on over-night and extended business trips. They went to Atlantic City on numerous occasions and on trips to California, Oregon and North Carolina. He told her that he was miserable at home, in love with her and wanted to get a divorce and marry her; in fact, up until the time of his death he was always anxious to marry her, but this never came about. As time went on, she did a number of things for the decedent, the nature of which were unrelated to his business affairs. She picked up and delivered packages for him, had medical prescriptions filled, put drops in his ears, mixed gargles and handed pills to the decedent, massaged his shoulders, clipped the hairs in his ears, helped him to take care of a dandruff condition, and gave him pedicures. She also accompanied decedent when he bought suits and she purchased socks for him. From time to time she advised the decedent what he ought and ought not to eat. Although she never testified with any particularity about the frequency of rendition of services of either a business or personal nature, she said that she rendered similar services to the decedent before and after his wife's death. All of the foregoing came from the lips of the plaintiff.

The major issue in this litigation is whether, after the death of the decedent's wife in April 1951, the plaintiff performed whatever services she may have rendered to the decedent as a mere gratuity, as might be done by one fond of another without expectation of compensation, except perhaps a voluntary testamentary token of appreciation; or whether what she did was in expectation of payment of moneys, which expectation was continuously renewed by the actual receipt of moneys from time to time and possibly the presumption that a substantial bequest would be provided for her by the decedent; or whether what she did was consideration for an enforcible agreement under the terms of which moneys given *inter vivos* were disregarded and compensation was to be made in the form of a bequest by the decedent.

Plaintiff contends that her services were not rendered gratuitously or with the mere hope of a beneficent act by the decedent or in return for moneys which he gave her intermittently for her support, but that the *sine qua non* of what she did for the decedent was a promise by him that he would provide for her in his will. The plaintiff goes further and claims that she and the decedent entered into a specific agreement to this effect shortly after the death of decedent's wife, and that if this agreement had not been made she would have ended her relationship with him and undertaken an activity which would have allowed her no time for the decedent. The agreement as alleged in the complaint and testified to by plaintiff at the trial provided that she would give the decedent her companionship and services by way of practical nursing care whenever he chose to avail himself of such companionship and services during his lifetime, in return for which the decedent would make provision in his will for an annual income to her of $7,000 as long as she lived.

Just how these two persons came to enter into the alleged agreement was the subject of much testimony by the plaintiff. The plaintiff stated that the decedent's wife was very ill before her death and that consequently she, the plaintiff, did not see the decedent immediately before or after that occurrence. To quote her own testimony as to what happened at this time and what transpired upon the first occasion on which

she saw the decedent after his wife died in the Spring of 1951:

"I had been alone for that time, and I got worried about my security * * * and at the time I was alone I realized I had to think of my support, so I decided to open a business for myself and have security that way * * *.

"And I told him (the decedent) I decided to open a business and go into business for myself and have a security, and that I would break off my relationship with him altogether * * * and he asked me not to, and I said I couldn't see going on any more with it, and he told me 'What do you need to go into business for, I can take care of you. I will take care of you.'

"And from that we went over (from plaintiff's apartment) to Mrs. Levins' apartment (in New Jersey), and we started—I had spoken to my friend, Margaret (Levins), before about my decision, and when we got there Mr. Lenkowsky (the decedent) said to Margaret: 'How do you like May? Now she wants not to see me any more, now that I am free and we can be married. Now she wants to break it off. She wants security; she wants to go into business for herself. Why, I can give her—how much money can she earn if she goes into business for herself?' * * *

"I decided if I went into business I could earn $7,000 a year. It would mean much harder work that I would be doing. I would have to give up a lot more time to it, and he said, 'Why do that?'

"He said, 'I want to see you. I need you now more than I ever needed you, and please give up the idea of going into business, and I will see that I make it in my will that you get $7,000 a year.' * * *

"He said, 'I need her more than she needs a business. She said she can make $7,000 a year. I want to give her $7,000 a year so that she doesn't go into business, and be free to do what I want her to do and when I want her to do it.' * * *

"After quite a lot of conversation I said I would go along as he said, and I took his word for it that he would leave me $7,000 a year in his will * * * For the rest of my life."

Plaintiff further testified that in return for the promise of a bequest

"He asked me to give him my companionship * * * Be with him every time he needed me * * * Take care of him * * *

That is about all, sir."

By "companionship" the plaintiff said she meant "Being with him when he wanted me to and taking care of him" on such occasions when he asked her to.

She continued to live at her own apartment in New York City and to engage in her work as a beautician, while the decedent continued to live in North Arlington and carried on his active business life. She said she saw the decedent three times a week and that "If he wanted to see me oftener all he did was call me and I came over." She stated that she rendered the same services and offered the same companionship after the making of the alleged agreement as she had rendered and afforded for a number of years previous thereto. "There was no change in the relationship * * * We went on as before, as he asked me to."

According to the plaintiff, the only persons present when the alleged agreement was made were herself, the decedent and Mr. and Mrs. Levins. The Levins were not called as witnesses but the plaintiff did call four persons, each of whom testified that he or she had conversations with the plaintiff or the decedent, or both, on the subject of the decedent's intentions with respect to making provision in his will for the plaintiff.

One of these persons was a cousin of the decedent who lived in the same apartment building as the decedent from early 1952 until the latter's death. She testified that decedent made a practice of

stopping in her apartment on his way home at night and that he often had dinner and spent the evening with her and her husband. On occasion, the plaintiff accompanied the decedent. Some time after the witness met the plaintiff, these two persons saw each other in New York and the plaintiff advised that she had nothing to worry about as the decedent was going to take care of her. Although this witness said that the decedent always told her everything and asked for advice, she said she never discussed this matter with the decedent until one evening in April 1953 when the plaintiff and the decedent came for dinner. At that time the plaintiff was crying because the decedent had not yet made provision in his will for her. The decedent said that he would do so when he got a chance. Nearer the time of his death, the witness said the decedent told her that he had changed his will and made provision for her and the plaintiff. The witness denied any knowledge of the illicit relationship between the plaintiff and the decedent and made no mention of the plaintiff having done anything for the decedent in return for a bequest.

The husband of this witness testified that he had discussed with the decedent his plans for providing for the plaintiff. He said the decedent told him that he didn't want the plaintiff to go into business for herself because if she did he would not see her as often as he liked' and that he had told her that if she gave up this idea he would take care of her for the rest of her life. The decedent was further reported to have said that he was very fond of the plaintiff and that she had given him more comforts and more pleasures than he had obtained in his entire life with his family. The decedent was also reported to have said that he offered to buy the plaintiff homes in Cranford and Deal, New Jersey, but that she would not marry the decedent because his children would object. The witness testified that the decedent expressed himself as being torn between marriage and his children. This witness gave the same version as did his wife of the discussion which occurred when decedent and plaintiff came to dinner in April 1953.

Another cousin of the decedent testified that she saw the plaintiff on two or three occasions when she visited the decedent. At those times the plaintiff was a general hostess, and besides mixing drinks she brought medicine to the decedent and took his clothes to the cleaners. In the plaintiff's absence, the decedent explained that he was fond of the plaintiff, that he wanted to buy her a house in Cranford, that she went with him everywhere he wanted to go and that he wanted to marry her but that his children, whom he loved, objected. This witness testified that she was present at her sister's apartment shortly before the decedent's death, when he advised that he had made a new will and provided for the plaintiff.

A New York neighbor of the plaintiff testified that she saw the decedent several times when he came to plaintiff's apartment. In January 1952 the plaintiff had spoken to this neighbor about the decedent and the latter's promise to provide her with a bequest. That evening, when the decedent arrived, the neighbor mentioned that the plaintiff had been upset about this matter. The decedent was apparently annoyed with the plaintiff for having discussed the subject, but when the plaintiff was out of the room the decedent said that he was going to provide for her.

The defendants, who denied the existence of any valid and enforceable agreement, confronted the plaintiff on cross-examination with certain statements made by her on a pre-trial deposition. It appears that while the plaintiff's testimony at the trial was that the agreement sued upon came about because she refused the decedent's proposals of marriage after his wife's death, upon deposition she testified that she and the decedent had agreed, shortly after his wife's death, that they would be married in a year, and furthermore that she and the decedent were contemplating marriage right up to the year of decedent's death. At the trial the plaintiff stated

that at the time of the making of the alleged agreement her future security was paramount to everything else and she only agreed to go on with the decedent because he promised to make a bequest of a specified annual income to her for the rest of her life; yet on deposition she testified that she had not discussed the question of her security to any great extent with the decedent. Faced with these conflicts, the plaintiff took the position that her deposition testimony was the truth.

The defendants called a doctor who had treated the decedent from 1935 to December 1951 and another doctor who treated the plaintiff from September 1952 until the time of his death. Both doctors denied that the decedent's physical condition during the periods mentioned required that he have practical nursing care, despite the fact that he was temporarily confined in hospitals in the summer of 1952 and the spring of 1953 for a heart condition.

A daughter of the decedent testified that she lived in the apartment building in North Arlington when the decedent moved there after his wife's death and that she continued to live there until January 1952. She said that her father had breakfast with her every morning when he was not away on business and that she took care of his apartment each day. With respect to the plaintiff, she testified that she never saw the plaintiff at the decedent's apartment between June 1951 and January 1952.

A daughter-in-law of the decedent testified that she also lived in the same apartment building with decedent from the time he moved in until at least sometime in 1953. She said that before her sister-in-law moved away she used to see the decedent almost every evening and that after her sister-in-law moved, the decedent had breakfast with her. She testified that she first met the plaintiff in late 1952 at decedent's apartment.

Testimony of these and other witnesses was to the effect that after the decedent was first hospitalized with a heart condition in the summer of 1952 he employed a houseman to take care of his apartment and to chauffeur him wherever he wanted to go and this houseman remained in his employ until his death.

At the close of all the evidence the defendants moved for a directed verdict under Rule 50. The motion was denied and the case was submitted to the jury on special findings pursuant to Rule 49 (a). The questions and the jury's answers thereto are set forth below.[1]

---

1. "To the Members of the Jury:

"As instructed by the Court, you are requested to answer the following questions. Answers must be either Yes or No, except as to question 9:

"1. In or about May 1951 did Louis Lenkowsky offer to make provision in his will for the payment of $7,000.00 annually to May Regan as long as she lived, provided that May Regan would give Louis Lenkowsky her companionship and services by way of practical nursing care whenever he chose to avail himself of such companionship and services during his lifetime?

"Answer: Yes.

"2. If Louis Lenkowsky made the offer as set forth in question 1, did May Regan accept the offer?

"Answer: Yes.

"You will answer the following questions only if the answer to Question 1 is Yes and the answer to Question 2 is also Yes.

"3. Was the acceptance by May Regan made in New York?

"Answer: No.

"4. Was the acceptance by May Regan made in New Jersey?

"Answer: Yes.

"5. Did May Regan perform all of her part of the agreement?

"Answer: Yes.

"6. Was submitting herself to intimacy with Louis Lenkowsky part of the companionship and services which May Regan was to render under the agreement?

"Answer: No.

"7. Was the agreement sued upon made in contemplation of marriage between the parties?

"Answer: No.

"8. Was Louis Lenkowsky induced to make the agreement sued upon by fear of reprisal by the plaintiff against him?

"Answer: No.

"9. If the plaintiff is entitled to recover on the alleged agreement sued upon, what is the amount of her damages?

"Answer: $133,204.40."

By virtue of Rule 50, the case is deemed to have been submitted to the jury subject to a later determination of the motion for directed verdict. Upon their motion to set aside the verdict and the judgment entered thereon and to have judgment entered for defendants, the defendants renew all of the arguments made in behalf of a directed verdict. These arguments will be considered seriatim.

In the first place, the defendants take the position that the plaintiff's sole remedy is an equitable proceeding for relief in the nature of specific performance of the alleged oral agreement and that an action at law for damages does not lie. Generally speaking, breach of contract gives rise to an action for damages and this is certainly so in the case of non-performance of a contract to bequeath a sum of money. Holcombe v. Griggs, Sup.Ct.1909, 78 N.J.L. 186, 73 A. 37; Bente v. Bugbee, E. & A. 1927, 103 N.J.L. 608, 137 A. 552, 58 A.L.R. 1137; Van Houten v. Van Houten, E. & A. 1916, 89 N.J.L. 301, 98 A. 251; Cullen v. Woolverton, E. & A. 1916, 65 N.J. L. 279, 47 A. 626. Contrary to what the defendants contend, the plaintiff is not entitled to equitable relief. The alleged promised bequest was not to be of any specific money and nothing is alleged which related it to any specific property. Only when a remedy by way of damages is inadequate may the injured party sue in equity for breach of a contract to bequeath. Sullivan v. Margetts, App.Div. 1950, 9 N.J.Super. 189, 75 A.2d 743; Galloway v. Eichells, Ch.1948, 1 N.J. Super. 584, 62 A.2d 499; Welsh v. Hour, 1927, 100 N.J.Eq. 417, 136 A. 327. For this reason, at the outset of the trial, the Court granted the defendants' motion to dismiss plaintiff's second count for equitable relief.

The defendants also contend that, assuming the plaintiff had established an agreement to compensate her for services rendered, she is entitled to recover only the reasonable value of such services and not the amount agreed upon by the parties as compensation. But there is nothing inherently unique about contracts which provide for payment by a legacy that prevents recovery of the contract price, and it is clear under the Bente and Van Houten cases, supra, that recovery may be had for the full amount of the compensation agreed upon by the parties. Where, as in the instant case, the promise alleged is to bequeath an amount sufficient to provide a certain annual income to the plaintiff, the amount due under the contract may be readily calculated by annuity tables. Strakosch v. Connecticut Trust & Safe Deposit Co., 1921, 96 Conn. 471, 114 A. 660.

The defendants urge that a verdict should have been directed because the plaintiff's proof of the existence and terms of the alleged oral agreement does not meet the evidentiary standards established by law, since to entitle a claimant to relief upon an oral contract to bequeath the proof must be clear and convincing. The New Jersey decisions which set forth a test greater than the mere preponderance of the evidence for relief on oral agreements to bequeath or devise all involve suits for specific performance, e. g. Robertson v. Hackensack Trust Co., 1949, 1 N.J. 304, 63 A.2d 515 and Cooper v. Colson, E. & A. 1904, 66 N.J.Eq. 328, 333, 58 A. 337; and no case has been cited, nor is any case readily found, in which a burden of clear and convincing proof has been imposed upon a plaintiff in an action at law for damages for breach of such an agreement. Although there may be sound reasons why those who seek equitable relief should be required to meet a higher standard of proof, it is nevertheless not easy to justify a different rule for actions at law in cases of this kind. And there is support for the view that in jurisdictions where a strict rule prevails in equity, a similar rule should be applied in actions for damages. 4 Page on Wills (3d ed. 1941) § 1749; Annotation, 69 A.L.R. 14, 84. Pursuant to this reasoning, the jury was instructed that it could only find that an agreement was entered into by the plaintiff and the decedent if the evidence of its existence and terms was clear and

convincing. The defendants do not complain of the application of a clear and convincing test but argue that on a motion for a directed verdict the court should determine whether the evidence meets that test. Since, however, the jury is the fact-finding body, it seems appropriate in a jury case that the jury should determine, under appropriate instructions from the court, whether the proof is clear and convincing. A thorough review of the evidence discloses that if the testimony on behalf of the plaintiff is considered most favorably to the plaintiff, together with reasonable inferences flowing from such consideration, it could not be said that the plaintiff had failed to make out a prima facie clear and convincing case. Consequently, the plaintiff is entitled to survive a motion for a directed verdict and a motion for judgment under Rule 50(b). Gold v. Groves, 3 Cir., 1950, 182 F.2d 767. The reasonableness of the jury's action upon all of the evidence can be tested by a motion for a new trial. Magee v. General Motors Corp., 3 Cir., 1954, 213 F.2d 899.

■ The defendants make the argument that the agreement alleged and testified to by the plaintiff is not a binding contract inasmuch as its terms permitted the decedent to follow a course of conduct which would not obligate him in any way to the plaintiff. The reasoning is to the effect that the decedent might choose to have the services of the plaintiff, but on the other hand, he might not, and in the latter instance he would owe the plaintiff nothing. This reasoning is based upon a misconception of the alleged agreement, for under its terms the decedent agreed to make a bequest whether or not he ever called upon the plaintiff for services. Only the selection of the occasions for the rendering of services was left to the determination of the decedent. Consequently, the agreement testified to by the plaintiff was not "illusory". By its terms whether or not the decedent called upon the plaintiff he was still obligated to perform. Only if a party to a contract has an alternative course of conduct which would be insuffi-

cient consideration if it alone were bargained for is the contract illusory. Restatements, Contracts, §§ 79, 84(f).

Further, the defendants assert that the agreement here involved is unenforceable as against public policy. Two reasons are advanced. The first is that in New Jersey only a licensed practical nurse can recover on a contract calling for practical nursing care; the second is that the illicit relationship between the plaintiff and the decedent was one of the terms of the alleged agreement.

■ It is not disputed that the plaintiff is not and never has been licensed as a practical nurse, and it is true that the agreement alleged and testified to by her provided that she should render "companionship and services by way of practical nursing care". Nor is there any doubt that the law of the State of New Jersey requires that persons rendering "practical nursing", as that term is defined by statute, be licensed. N.J.S.A. 45:11–23 et seq. The courts of New Jersey have held that, if a license is required for a particular profession or occupation, failure to be licensed will preclude a person from recovering on a contract to perform services within the scope of the licensing statute. Corson v. Keane, 1950, 4 N.J. 221, 72 A.2d 314; Gionti v. Crown Motor Freight Co., E. & A. 1942, 128 N.J.L. 407, 26 A.2d 282; George H. Weinrott & Co. v. Burlington Housing Corp., Ch.1952, 22 N.J.Super. 91, 91 A. 2d 660. Thus, the plaintiff would have to be denied relief if the alleged agreement required the rendition of "practical nursing" as that term is employed in the statute, namely, "the performance of such duties as are required in the care of a patient in carrying out the medical orders prescribed by a licensed physician, requiring an understanding of elementary nursing but not requiring the professional service outlined in the definition of professional nursing." N.J. S.A. 45:11–23. On the other hand, if it was not the intent of the parties that services such as those described in the statute were to be performed by the plaintiff and such services were not in

fact performed, then the contract is not unenforceable as against public policy. There is nothing in the record which indicates that the decedent and the plaintiff, if they entered into any agreement, contemplated that services for which the New Jersey statute would require the plaintiff to be licensed would be rendered. Nor is there any evidence that such services were in fact performed. For its purposes, the statute makes the term "practical nursing" a term of art. The words "practical nursing care" appear in this litigation not as a term of art but as a general descriptive term of the broadest nature comprehending a range of services falling outside of those covered by the statute cited by the defendants.

■ A careful appraisal of the evidence does not lead to the unavoidable conclusion that the illicit relationship, which the plaintiff admitted existed between her and the decedent both before and after the making of the alleged agreement, was either an inseparable part of the consideration or a necessary part of the performance of the agreement sued upon. If such fact appeared, undoubtedly it would be a ground for dismissal of the plaintiff's action, for when part of a contract is illegal and in violation of a penal statute the entire contract is treated as illegal and the court, being unwilling to aid a wrongdoer, will leave the parties where it finds them. Stack v. P. G. Garage, Inc., 1951, 7 N.J. 118, 80 A.2d 545. But whether immoral acts were bargained for and therefore constituted some part of the contractual consideration, or whether such acts were unrelated to the terms or performance of any agreement, were issues of fact to be determined by the jury.

■ The defendants also argue that the consideration for any agreement between the plaintiff and decedent is insufficient since the plaintiff bound herself to provide no more than mere love and affection. Clayton v. Clayton, Sup. Ct.1941, 125 N.J.L. 537, 17 A.2d 496, affirmed per curiam, E. & A. 1942, 127 N.J.L. 605, 23 A.2d 560; Cockrell v. Mc-Kenna, E. & A. 1926, 103 N.J.L. 166, 134 A. 687, 48 A.L.R. 234. The evidence does not support the defendants. The services which were, according to the plaintiff, to constitute consideration for the contract transcended mere love and affection.

■ Finally, much emphasis is laid by the defendants upon a contention that if any agreement was entered into by the plaintiff and the decedent it was made in New York where the statute of frauds declares oral agreements to bequeath to be null and void. McKinney Personal Property Law, Consol.Laws, c. 41, § 31, subd. 7. The plaintiff was the only witness who testified as to the making of an agreement. The defendants point to a statement made by the plaintiff that the decedent first agreed to make a bequest to her at her apartment in New York. This, the defendants say, constitutes an admission by the plaintiff as to the place of the making of the agreement sued upon. But the fact that the decedent may have agreed or indicated his willingness to make a bequest does not, when taken alone, mean that both parties had a meeting of the minds at that time, which, of course, would be necessary to the formation of a contract. Furthermore, while the plaintiff testified that the decedent agreed to make a bequest at her apartment, she neither stated that she accepted his offer at that time nor indicated that she had made any offer which he could have accepted by his promise. The plaintiff's testimony quoted above is clearly to the effect that there was much discussion at the Levins' in New Jersey as to whether or not she and the decedent would continue their relationship. Plaintiff's own words were "After quite a lot of conversation I said I would go along as he said, and I took his word for it that he would leave me $7,000 a year in his will." This being the status of the record, perhaps it was quite unnecessary to submit to the jury the questions as to where, if at all, an agreement was made.

None of the grounds advanced by defendants being sufficient to support a di-

rected verdict, their motion to set aside the verdict and judgment and to have judgment entered in accordance with their motion for a directed verdict must be denied.

It remains to consider defendants' motion for a new trial on the ground that the findings of the jury are against the weight of the evidence. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147. In doing so, the trial court is not limited to taking that view of the evidence which is most favorable to the plaintiff. Rather it is the duty of the court to weigh the evidence and all other relevant factors, and the mere fact that there may be evidence to support the plaintiff's claim does not mean that a new trial ought to be denied if the court believes that the jury's findings produce a miscarriage of justice. Magee v. General Motors Corp., 3 Cir., 1954, 213 F.2d 899. There are any number of reasons why a jury's action will not be allowed to stand. It may be that passion or prejudice caused the jury to ignore the controlling evidence in a case or the jury may have reached its conclusion upon the basis of patently false testimony. Under these and other circumstances where the result reached by the jury shocks the court, a new trial must be granted.

The fundamental factual issue in the instant case is whether or not the plaintiff and the decedent entered into a certain bilateral oral contract. The issue is not whether the decedent ever said he would leave the plaintiff some money in his will, but rather whether the decedent promised that he would provide plaintiff with an annual income of $7,000 in return for a promise by plaintiff to render companionship and services by way of practical nursing care whenever he requested. The plaintiff says that these promises were exchanged in or about May 1951 following the death of decedent's wife. The decedent, not being alive, cannot give his own version of the matter, and by reason of this fact and the opportunity that exists for the assertion of fabricated claims against decedents' estates the law requires that the party seeking to recover upon an oral agreement to make a bequest establish the existence of the contract by clear and convincing proof.

What is relevant under the circumstances to the issue which must be determined? The testimony of the plaintiff, if permitted as in this case, certainly is relevant, and once having undertaken to relate her story, the inherent consistency of her story, any conflict with the testimony of other witnesses and her demeanor are of the utmost significance. The testimony of persons present when the contract was alleged to have been entered into would naturally be highly relevant, especially if, as the plaintiff indicates, such persons participated in the discussions preliminary to the contract. Since plaintiff's burden is more than a mere preponderance of the evidence, a failure to produce or take the depositions of all such persons without satisfactorily accounting therefor gives rise to a strong inference that their testimony would be unfavorable to the plaintiff. Series Publishers, Inc., v. Greene, App. Div.1950, 9 N.J.Super. 166, 75 A.2d 549. Their testimony cannot be said to be merely corroborative where plaintiff must meet a test of clear and convincing proof. O'Neil v. Bilotta, App.Div.1952, 18 N.J.Super. 82, 86 A.2d 705. Further, conditions contemporaneous with the making of the alleged contract may be relevant, as well as conduct of the parties at that time. Inasmuch as the decedent was only to enjoy the companionship and care of the plaintiff when he so desired, the fact that subsequent to the making of the contract he may never have called on the plaintiff to perform is of little if any importance. The fact that the plaintiff was subsequently in the company of the decedent is of approximately the same significance. Subsequent declarations by the decedent to third parties during conversations in which the plaintiff did not participate have not been accepted as evidence of the existence of a contract. Cramer v

McKinney, 1946, 355 Pa. 202, 49 A.2d 374. Certainly, self-serving declarations by the decedent on that subject are irrelevant and inadmissible. Robertson v. Hackensack Trust Co., 1949, 1 N.J. 304, 63 A.2d 515.

Bearing in mind the foregoing, the relevant evidence may be examined. It would seem appropriate to start with the plaintiff's testimony. Her case in support of the existence of a contract is built upon three major propositions: first, the decedent's physical condition was such as to make it desirable for him to retain someone who could provide him with companionship and care from time to time; second, the plaintiff was concerned principally about her financial security in the future; and third, the plaintiff refused to marry the decedent. These were the factual ingredients which the plaintiff testified on her direct examination gave rise to the making of the alleged contract in or about May 1951. But upon cross-examination, she recanted with respect to each and every one of these fundamentals. The plaintiff admitted that the decedent had no serious ailment until the summer of 1952, a year after the contract was alleged to have been made, and that certainly at least up until the summer of 1952 there was nothing about his physical condition that caused him to require any care from another person. Such admission coincides with the testimony of two doctors who treated the decedent. When confronted with earlier testimony given on deposition with respect to the two other propositions, the plaintiff stated that her earlier version of the facts was true. Upon deposition she had stated that she had never discussed the matter of her financial security to any great extent with the decedent, and she had admitted that in and after May 1951 she and the decedent were definitely contemplating marriage. These inconsistencies in the plaintiff's testimony cannot be brushed aside since they go to the very heart of the plaintiff's case and deal with matters which are supposedly the point of origin

of the alleged agreement. Nor can these inconsistencies be reconciled, for they involve facts which the plaintiff surely could not have forgotten one day and remembered another. Aside from the foregoing, there are several conflicts between her testimony and the testimony of witnesses called both by her and by the defendants. The matters involved are peripheral and no more will be said than that upon any reasonable view of the evidence the conflicts must be resolved against the plaintiff. These inconsistencies and conflicts, taken all together, force a conclusion, not dispelled by the plaintiff's pleasant appearance, that she has implemented truth with fiction.

The plaintiff testified that Mr. and Mrs. Levins were present and participated in conversations leading to the making of the alleged agreement. Although plaintiff indicated the Levins were in Florida, no satisfactory explanation was given for failure to take their depositions. The result is a strong inference that their testimony would be to the effect that no agreement was made.

In considering the conditions which existed in or about May 1951, it is clear that following the death of his wife in April of that year, the decedent made arrangements to move into an apartment in the same building with apartments occupied by his daughter and his son, of whom he was very fond. Under such circumstances, it taxes credulity that the decedent would have entered into a lawful and therefore enforceable agreement for companionship and nursing care with someone who, according to the plaintiff's testimony, was objectionable to the decedent's children.

The testimony of the witnesses called by the plaintiff added little if any relevant evidence. Statements which were reported to have been made by decedent in the presence of the plaintiff were completely consistent with nothing more than an intent to leave money to the plaintiff. A testator's failure to formalize a beneficent intent does not, of course, give rise to an action for damages.

The finding by the jury that the plaintiff and the decedent entered into the contract sued upon is manifestly against the weight of the credible evidence. Were plaintiff's burden a mere preponderance of the evidence a new trial would have to be granted to prevent a miscarriage of justice. *A fortiori* such will be the action of the court when, as here, the plaintiff's proof must be clear and convincing.

An appropriate order may be submitted.