**Aston BARTHOLOMEW, Plaintiff,**

v.

**UNIVERSE TANKSHIPS, INC.,
Defendant.**

United States District Court
S. D. New York.
Nov. 27, 1957.

Koenig & Shreck, New York City, for plaintiff. Morton M. Shreck, Nathan Berke, New York City, of counsel.

Frederick H. Cunningham, New York City, for defendant. Victor S. Cichanowicz, New York City, of counsel.

CONGER, District Judge.

Action by plaintiff for damages based on negligence and unseaworthiness. The case was tried to the court with a jury. The jury brought in a verdict for plaintiff for $24,600. Defendant has moved under Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to have the jury's verdict set aside and judgment entered for the defendant. This motion is denied on the authority of Zimmerman v. Emmons, 9 Cir., 225 F.2d 97.

At the end of plaintiff's case, defendant did make a motion. It was rather long and involved. If it may be considered and construed as within the provisions of Rule 50(b) F.R.C.P., then I deny such motion for the reasons hereinafter set forth.

Defendant further moved, in the alternative, pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, for an order setting aside the jury's verdict and granting a new trial. It sets up some eight grounds upon which it bases the relief asked for. I shall not refer to each of them separately, but only to those I feel are substantial, and a general discussion will dispose of all of them.

Plaintiff was a seaman working on defendant's vessel. His claim was that on or about the 15th of April, 1952, he was assaulted and viciously beaten by one of his fellow seamen aboard the vessel, and seriously injured. His testimony was that this seaman, Duzzel Solomon, without provocation, started hitting plaintiff in the face with his hands, knocked him to the deck, and then "trampled" plaintiff in the face with his feet, then picked up plaintiff, raised him up and attempted to throw him overboard. The testimony on the part of the plaintiff was that at no time did plaintiff strike or raise his hands to his assailant.

There were two branches to the case, one based upon negligence (Jones Act, 46 U.S.C.A. § 688) and the other based upon the unseaworthiness of the vessel.

I charged the jury at length on both the question of negligence and of unseaworthiness. On the question of negligence, the theory was that the defendant failed to furnish plaintiff with a safe place to work in that it permitted inclusion in the crew, of which plaintiff was a member, of a person whom defendant knew or, in the exercise of reasonable diligence, should have known, to be a person of dangerous propensities and proclivities; and the claim of plaintiff was that in the course of his work this sailor viciously and without provocation assaulted him. Among other things, in connection with this, I charged the jury as follows:

"If a member of the crew was of a vicious and belligerent nature and likely to inflict bodily harm upon

other members of the crew, and if such fact was known to the defendant, its officers or agents, or should have been known to the defendant, its officers or agents by the exercise of ordinary diligence, the defendant was obligated to exclude such person from employment on board its ship."

The other branch of the cause of action was unseaworthiness, in which plaintiff claimed that the vessel was unseaworthy because it included a member of the crew who was not the equal in disposition and seamanship to the ordinary man in the calling, a seaman with dangerous propensities and proclivities; that by reason thereof the ship was made a perilous place. In this connection, see Boudoin v. Lykes Bros. S. S. Co., D.C., 112 F.Supp. 177; 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354.

I charged the jury fully, and I believe correctly, on the doctrine of unseaworthiness in connection with this kind of case. Among other things, I charged:

"The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question. Applied to a seaman, such a warranty is not that the seaman is competent to meet all contingencies but that he is equal in disposition and seamanship to the ordinary men of the calling.

"In connection with his claim based on unseaworthiness, the sole ground of unseaworthiness asserted against the defendant was the inclusion in the crew of a person, Duzzel Solomon, who, the plaintiff alleges to be of a vicious nature, with a history of assaulting fellow crew members."

██ These issues presented questions of fact and there was evidence from which, I believe, the jury might find for the plaintiff on either branch of the cause of action. There certainly was not an absence of evidence; there was some evidence, so that I felt and still feel it was a matter for the jury to decide, not a question of law for the court.

Of course, the first issue met in this case, after the question of jurisdiction to which I shall refer later, was the question of a release. I instructed the jury to pass on this first before going into the merits of the case. As I said before, the incident complained of occurred on April 15, 1952. The ship docked on April 28, 1952, at Philadelphia, after which plaintiff came to New York. Within a few days he went to the office of the defendant in New York, where he finally met an attorney for the defendant (Mr. Antopole), who sent him to several doctors for examination. He was also given some money on account of maintenance. Subsequently, discussions of settlement were commenced and thereafter and on or about June 3, 1952, it was contended by defendant that plaintiff signed a general release for $532, $132 of which was for advances made to plaintiff for maintenance, and $400 of which was in consideration of the release of all his claims against defendant.

██ Plaintiff testified that he never understood he was signing a general release, but that he thought he was signing a receipt for advances made to him. However, the testimony of defendant as to the signing of the general release was very strong and included the testimony not only of Mr. Antopole but of his secretary and another man in the office. The jury may very well have come to the conclusion from the evidence that plaintiff did sign a general release knowing that he was signing a release, but it seems to me that this does not dispose of the issue. The rule is that seamen are more carefully protected by the courts in their rights than is the ordinary run of mankind, and the burden, in the last analysis, was on the shipowner to show that the release was fairly made and fully comprehended by the seaman. I charged the jury, among other things, on this issue as follows:

"I charge you that although a seaman is not incapable of entering into a valid release, nevertheless such re-

lease should be subject to rigid scrutiny. This is a special rule in the case of seamen.

"You must be satisfied that the release signed by the plaintiff was executed freely, without deception, over-reaching or coercion, and that it was made by the plaintiff with full comprehension of his rights. The adequacy of the consideration paid him, his mental condition, the nature of the medical and legal advice, if any, available to him at the time of his signing the release are all relevant to your appraisal of his understanding."

In coming to its decision, the jury may very well have taken into consideration the fact that at the time of the signing of the release plaintiff was without an attorney and had no doctor of his own. The testimony of the defendant's attorney was that he informed plaintiff that the defendant's doctors who had examined plaintiff could find nothing seriously wrong with him and further that he, the attorney, could see nothing much of injury; that the plaintiff had had severe headaches before the accident. He also informed plaintiff that, in his opinion, if plaintiff had provoked the assault, he would not get anything and that, in the opinion of the said attorney, plaintiff would get nothing except maintenance and cure. The jury may very well have come to the conclusion that the consideration for the release was inadequate and that at the time of the signing of the release plaintiff was not aware of the seriousness of his injuries and of the serious condition that would later result from the accident. The jury may have taken into consideration also the fact that the plaintiff was more seriously injured at the time he signed the release than the plaintiff either knew or had reason to believe or that the doctors for the defendant knew. The jury may have come to the conclusion that plaintiff's real damage and disability occurred some time after the execution of the release and was not within the contemplation of the plaintiff or defendant's doctors.

True, plaintiff was a man of some education and intelligence. However, releases by such persons have been declared to be void. United States v. Johnson, 9 Cir., 160 F.2d 789, 796. After all, it was a question of fact for the jury. There was sufficient evidence, in my opinion, to send the case to the jury on this point. I believe I should not set aside the jury's determination on this issue.

We now come to the question of damages.

After the accident, plaintiff went to work at Macy's in New York City, where for approximately five months he worked very well and gave good satisfaction as far as his work was concerned. However, in July 1953, at the request of the authorities at Macy's, he was sent to Kings County Hospital for treatment, apparently with a mental quirk of some kind. He was there for several weeks. From that time on, plaintiff testified, he has not worked and was unable to work, by reason of his condition. His complaints were, among other things, headaches, pain in the forehead, ringing in the left ear, headaches in back of the left ear, dizziness about twice a day, nervousness, easily fatigued, insomnia and visual disturbances; that he had a character change in that he became irritable, argumentative, lost his sense of humor and facility of speech, was depressed, excited easily, angered his friends, was unable to concentrate, had loss of memory, body tremors and quivering of the muscles.

Plaintiff produced as a medical expert one Dr. Carroll Nichols, who stated that he was a specialist in the treatment of nervous and mental diseases. He saw plaintiff first on January 14, 1953. The doctor testified that on a physical examination he found plaintiff to be depressed and apprehensive; that he had body tremors throughout the examination; that air and bone conduction were diminished in the left ear; he found a positive Romberg and other abnormal neurological signs. The doctor's diagnosis was traumatic encepholopathy and severe psychoneurosis of traumatic origin. The doctor saw the plaintiff in all about 13 times.

He examined plaintiff again on December 1, 1953 and testified that he found plaintiff in a worse condition. His symptoms were such that they indicated the patient had a concussion and was suffering from post-concussion syndrome. The doctor last examined plaintiff on September 26, 1957 and stated that the plaintiff's condition was improved in some respects and in others it was worse. The doctor was asked the following question and gave the following answer:

"Q. Based on your examinations of this plaintiff and your treatment of him, do you have any opinion in regard to a prognosis? A. Yes. The prognosis is bad. He may improve materially under proper intensive treatment—I do not know. He eventually, without much question in my mind, is going to end up in an institution because of this incipient schizophrenia that he has and which is in the report of the Kings County Hospital long before he showed · the overt symptoms to me."

The doctor further testified that plaintiff was unable to work at the present time. When asked whether with care he could return to work, the doctor said that he couldn't say; that during the five years that he had seen him, he was unable to work. The doctor further testified that the assault of April 15, 1952 was the competent producing cause of the injuries which he found plaintiff had.

In one respect, plaintiff's doctor was corroborated by Dr. Hyslop, one of the doctors who had examined plaintiff for the defendant and who testified for the defendant. He stated that plaintiff was an emotionally unstable individual with a chronic hypochondriacal attitude; that he had a schizoid personality, and was suffering from severe psychoneurosis, precipitated by trauma. His opinion was that the plaintiff would be disabled until his claim was disposed of.

Plaintiff's expert further testified that plaintiff's mental condition and the condition to which I have heretofore referred could become manifest some time after the accident—weeks or months afterwards.

The picture painted by plaintiff's physician certainly showed plaintiff to be incapacitated, surely at the time of trial and for some time prior thereto, by reason of his mental condition and his nervous condition. In his affidavit submitted hereon, the attorney for the defendant urges that Dr. Nichols' testimony, being replete with inconsistencies, requires complete rejection. Assuming that there were some inconsistencies, however, that is not sufficient for me to say, as a matter of law, that I would disregard his testimony, or arbitrarily regard it as a "fabrication or an imbecility". The doctor was just another witness. His credibility was an issue.

At the trial defendant produced three medical witnesses, three experts or doctors. Their testimony was at variance with the medical testimony of the plaintiff. There was a sharp contradiction as to plaintiff's physical condition, his injuries, the nature and extent of his injuries. This, of course, was a question of fact for the jury. The credibility of the medical witnesses and the effect or weight of their testimony, was a matter for the jury. The jury had the same opportunity I had of seeing the witnesses and of hearing their testimony. They apparently believed plaintiff's medical expert.

That being so, the jury might very well be justified in fixing the damages at $25,000 less the $400 theretofore received by plaintiff.

I should not and may not set this verdict aside as being grossly unreasonable or excessive unless it shocks the conscience of the court or it is clearly manifest that the verdict was the result of mistake, caprice, prejudice or passion. The fact that I might even disagree with the amount is not sufficient for me to set it aside, or the fact that I might make a different award. That is the general rule. Applying that rule, I would see no reason, under normal circumstances, to set this verdict aside on the ground that it is excessive.

I have heretofore referred to the issues of fact which I sent to the jury for their determination, that is, the question of the release, the question of liability for negligence and/or unseaworthiness, the question of damages, the causal relation of the assault to plaintiff's damage, and the extent and nature of plaintiff's damage. All these were controverted during the trial. On all of the issues there were facts, in my opinion, which justified sending those issues to the jury. The jury having decided them in plaintiff's favor, under normal circumstances I would have no hesitancy in sustaining the verdict of the jury.

However, there is an unusual circumstance here which I should discuss. Defendant's contention in this respect (a motion pursuant to Rule 59(a) F.R.C.P.) is that this court is not limited to taking the view of the evidence that is most favorable to plaintiff; that it is the duty of the court to weigh the evidence and all other relevant factors, and the mere fact that there may be evidence to support plaintiff's claim does not mean that a new trial ought to be denied if the court believes that the jury's finding produced a miscarriage of justice because passion or prejudice caused the jury to ignore the controlling evidence in the case, or that the jury may have reached its conclusion upon the basis of patently false testimony; that, under such circmstances, where the result reached by the jury shocks the court, a new trial should be granted. See Regan v. Lenkowsky, D.C., 137 F.Supp. 133.

 I don't quarrel with the above statement. I have come to the conclusion, however, that this verdict was not caused by passion or prejudice or false testimony, and the result did not shock the court. Defendant bases his contention upon the demeanor of the plaintiff on the witness stand. It is true that he appeared nervous. He was a difficult witness to examine; he hesitated for some period of time on some questions; closed his eyes, and incessantly tapped with his foot while seated in the witness chair. This last was not particularly disturbing, however. At one time when he was telling of the assault upon him, he became hysterical, rose in his chair, shouted and cried. Hysterical is the word. It was near the end of the day and I adjourned the court. In the absence of the jury I admonished him on his conduct and also admonished his attorneys. The next day and for the rest of the trial he was calmer but a rather nervous witness. At another point, I adjourned court when it appeared to me he was about to lose control of himself while seated in the courtroom, although I am not sure that anyone else noticed it.

On the whole, after serious consideration, I do not feel that passion and prejudice dictated the verdict of the jury. They might have been justified in taking a cant the other way; I don't know. And then, when I look at the amount of the verdict, it seems to me that that is a sign that points the way on this question. If the jury believed plaintiff's doctor, the verdict certainly was not so grossly unreasonable as to shock the conscience of the court. If the jury believed the testimony of the plaintiff and his witnesses and the medical testimony, I cannot say that the amount awarded is unreasonable and inconsistent.

There is something else to which I should refer, to which defendant's attorney has called my attention in a supplemental affidavit. After deliberating for some time, the jury announced that it had agreed upon a verdict. I had submitted to the jury six questions to be answered, relating to the release, negligence, unseaworthiness, damages, and contributory negligence. The jury had these questions with them in the jury room. The forelady of the jury announced that the verdict of the jury was for the plaintiff for $25,000, less the $400 paid on the release. I then asked for the envelope in which she had the questions. I saw that the questions were unanswered. I called the forelady's attention to it. Then the following occurred:

"The Forelady: Well, they seemed to think that we did not have to.

"The Court: Oh, yes.

"The Forelady: I thought we should.

"Juror No. 2: We answered them but we did not write them in."

I then stated that I could send the jury back to answer the questions. I asked the attorneys: "Do you want me to have them answer these here now?" Neither attorney objected, so I started on the first question:

"The Court: The first question is: 'Was the release executed by the plaintiff a good and valid release?'

"What is your answer to that?

"Jurors: No."

So I wrote as the answer to the first question "No".

Then it occurred to me that this was not the proper thing to do, so I finally suggested that the jury again retire and answer the questions. I did tell them this, however:

"Of course you answer 2 and 3 'No', then there can be no verdict for the plaintiff, you understand?"

The jury said they did. That meant that if they so answered that would be a finding that there was no negligence and no unseaworthiness. The jury returned a short time later and handed me the questions, all answered. I took each question separately, as the transcript shows, and asked the jurors whether the answer to each question was correct. They all said that they were their answers.

In addition to that, I polled the jury. The clerk asked each one if the verdict was for the plaintiff in the amount of $25,000 less $400, and whether or not they had answered the questions as I had just indicated. Each answered in the affirmative.

I see nothing wrong in this whole procedure. Of course the questions had to be considered. As I told the jurors, if their answers to "2" and "3" were "No", there could be no verdict for the plaintiff. I believe I was perfectly justified in sending them back to answer the questions.

Defendant's claim is that the rendition of the verdict without answering the questions was a violation of the trial court's instructions and therefore it was a verdict which was not in accordance with the court's instructions; in fact, contrary to them. However, I took care of the situation, I believe, and I am confirmed by a reading of the record.

The supplemental affidavit contains another statement which is not entirely correct, to which I think I should refer, that certain information was brought voluntarily to my knowledge after the verdict was rendered and the jury discharged: That without any urging of the trial judge or the attorneys, some of the jurors informed the trial judge that they had not reached unanimity on some of the questions on which unanimity was necessary to the verdict which the jury had rendered, and because of their lack of understanding of the trial court's charge or because of confusion, they rendered a monetary verdict which was a compromise because of lack of unanimity on some of the questions submitted to them.

As I stated before, this is not entirely correct. What happened was this: The jury rendered its verdict on a Thursday evening. The following morning I went to see the Calendar Commissioner for the purpose of arranging for another trial. By accident, I opened the door where the jury pool is. I happened to see several of the jurors there who had been on this case. We exchanged just a few words, nothing to do with the case. Suddenly one of the jurors said to me, "What did you think of the verdict?" I said, quickly, without thinking, "Well, it might have been more", or words to that effect. That is all I said. This juror then said, "Yes, that's right, we couldn't agree" (or "we didn't agree", I am not quite sure which), "that's why we didn't answer the questions." I quickly turned away and said I didn't want to discuss the case. That was about all that happened, as I remember it. However, as the record shows, they did answer all the questions and I was extra careful in going through each question with them as they sat in

the jury box. Later, when this motion was first argued, I told the attorneys of the incident as I have set it forth above.

I have gone into this matter very carefully, thought it all out. I don't know what went on in the jury room. I must assume that the jury followed my instructions. My charge, I think, was clear and to the point.

 Another issue was raised by the defendant early in the trial of this case, that is, the question of jurisdiction. Plaintiff was an alien, a resident of the United States, however; defendant's ship was under a foreign flag, that of Liberia. After the trial had opened, this question of jurisdiction was called to my attention. The suit was under the Jones Act and damages were also asked under the general maritime law (unseaworthiness). I stopped the trial either on the first or second day, and took up this question. It was discussed thoroughly, briefs were exchanged, I read the briefs, looked up the law myself in addition, and certain concessions were made by the attorney for the defendant. I finally decided that the Jones Act applied to plaintiff and that the unseaworthiness issue under the general maritime law would be tried at the same time before a jury on the theory of pendant jurisdiction. I followed the thought expressed by Judge Waterman in Troupe v. Chicago, D. & G. Bay Transit Co., 2 Cir., 234 F.2d 253, and held that plaintiff was entitled to a jury trial on both claims, negligence under the Jones Act and unseaworthiness under the general maritime law. I dictated an opinion into the record and then the trial continued, although the defendant did object and I believe protected himself by proper objections. I therefore do not refer again to it here.

Defendant's motion is denied.

At the close of plaintiff's case and at the end of the whole case, defendant moved to dismiss. I reserved decision. I now deny those motions.

Defendant also moves to dismiss the cause of action for maintenance and cure herein on the ground that there was no evidence to support a finding that any such recovery was due plaintiff.

At the commencement of this trial and without objection, I took from the jury the cause of action in the complaint for maintenance and cure. I held that this was a matter for the court to decide and should not be tried to the jury. Upon the argument of this application it was agreed and stipulated by the attorneys for both parties that the question of maintenance and cure would be reserved until the disposition of any appeal on the question of negligence and unseaworthiness. At any rate, it is not part of this application now.